399 A.2d 1095

**William J. GILL and Joan Gill, his wife, Appellants,**

v.

**McGRAW ELECTRIC COMPANY.**

Superior Court of Pennsylvania.

Argued April 13, 1978.

Decided March 16, 1979.

Lee A. Montgomery, Butler, for appellants.

Lee C. McCandless, Butler, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

SPAETH, Judge:

This is an appeal from an order denying appellants' motion for a new trial. Appellants were plaintiffs below, and appellee was defendant. Appellants argue that the trial judge erred in permitting appellee's expert witnesses to testify despite appellee's failure to give notice that they would testify, as required by a pre-trial conference order.

In 1973 appellants constructed a one story ranch type home in Butler County, Pennsylvania. John L. Brooks, an electrical contractor, installed an electric baseboard heating system designed and manufactured by appellee. On January 10, 1976, the house caught fire and was destroyed.

On August 6, 1976, appellants filed a complaint in trespass against appellee for the damages suffered as a result of the fire. The complaint was in three counts: Count I alleged that the heating system was defective and that appellee was strictly liable for the damages sustained as a result of this defect. Count II alleged that appellee was negligent in designing certain parts of the heating system, in using inferior materials, and in failing to adequately warn poten-

tial users of the fire hazards posed by the system. Count III alleged breach of express and implied warranties of the fitness of the unit. The damages demanded were $29,500.00.

On March 29, 1977, a pre-trial conference was held in the chambers of President Judge KIESTER. After preparing a statement containing a summary of appellants' theories of liability, the President Judge issued an order permitting an amendment to the demand for damages, and also providing that:

Plaintiff will make available to defendant a copy of the report of plaintiff's expert witness, together with the evidence that serves as the basis of the witnesses [*sic*] opinion as to the cause of the fire. Defendant will furnish plaintiff a copy of any oral or written report and opinion of its expert or experts. This should be done at least 10 days in advance of trial. Defendant will also furnish plaintiff with a list of all defense witnesses and any physical evidence that may be offered.

Reproduced Record at 8a.

Appellants amended their demand for damages to allege total damages of $53,086.14. Appellants claim that appellee did not provide any notice of expected testimony by expert witnesses, as required by the pre-trial order. No such notice is contained in the record.

The trial judge ordered a bifurcated trial. The jury was selected, and on May 19, 1977, the trial on liability began.

Appellants presented a video-tape deposition of an expert witness, Dr. Terry Hockenberry, a consulting engineer with a doctoral degree in electrical engineering. Dr. Hockenberry testified as follows. He examined appellants' home after the fire. By use of the "low point of the fire" method, he was convinced that the fire originated in the baseboard heating system in the master bedroom. He considered but ruled out other potential sources of the fire, including the wiring in the crawl space behind the wall of the bedroom. Having satisfied himself that the heater was the source of the fire, he examined it. He found it lying in the snow outside the house, where the firemen had thrown it during

the fire. He compared the damaged unit with another similar unit found in another bedroom of the house, which had not been damaged by the fire. After partially disassembling the fire-damaged unit, he decided that the damages sustained by it demonstrated that the right end of the unit had reached a very high temperature, and that this was evidence of a malfunction in the system. He explained:

Q Now, Doctor, from your examination of that unit that you removed from the Gill property after the fire, can you tell us the nature of the malfunction that you have indicated occurred?

A Yes, what happened to this baseboard heater was that a fault condition developed where the heating element wire contacted the metal ground, electrical ground of the baseboard heater. The, let me describe just briefly how this heating unit is made. The unit is eight feet long and over most of those eight feet there is a tube made out of aluminum which is filled with a material which is insulating and then inside that is the actual heating element wire. On the outside of this aluminum tube are little fins that are about two inches square which are just slid over the tube and spaced about a quarter inch apart or a half inch apart over the entire section of the heating element of the unit. These little square fins are the heat radiators of the baseboard heating unit, and they radiate the heat which comes from the heating element inside this tube and they want, they radiate the heat to the outside. What occurred in this particular baseboard heater was at a point about a foot from the right end the element wire inside the unit contacted the aluminum tube which was immediately surrounding it and caused an electrical fault which resulted in this section at the right end of the baseboard heater it became extremely hot and started to melt the aluminum tube and the fins on that end and as shown in photograph twenty-two and probably other photographs where this heating element comes is supposed to be horizontal, toward

the right end it dips down and is a distinct dip shown in photograph twenty-two where this heating element had become extremely hot as a result of this fault condition.

N.T. 33–34.

Dr. Hockenberry further testified that although the unit contained a thermostat, which should have shut down the system in the event of overheating, the contact of the wire in this case happened so suddenly, and the high temperature was reached so quickly, that the thermostat's reaction was too late to prevent the fire, which was caused when the extreme heat from the unit came in contact with combustible material in the room. He attributed the incident he described to faulty design of the system.

On cross-examination Dr. Hockenberry admitted that he had never personally designed a baseboard heater, but he said that he was familiar with such heaters and with the particular unit in question. He also admitted that he had not taken the tube apart, but he said that that was unnecessary because resistance readings obtained by the use of instruments had disclosed that there had been a contact of the wire with the tube. He also testified that the dip in the tube was caused by intense heat emanating from within the tube and not from the outside.

Mr. John Brooks testified for appellants that he had installed the heating system, that he received it from the manufacturer in a condition to be installed, and that he merely had to unpack it, remove the junction plate, ground it, attach it to the wall, and connect it to the wiring in the house. He also testified that he did not touch the interior workings of the heater or the tube, fins, or heating wire element.

Appellant William Gill also testified concerning the heater and the fire.

Appellee moved for a non-suit. When the motion was denied, appellee called as its first expert witness, Robert Kanutson, a licensed chemical engineer with experience as a fire inspector. Mr. Kanutson had been employed by appellee

for the past seventeen and one half years. Appellants objected, arguing that Mr. Kanutson should not be permitted to testify because appellee had not given the notice required by the pre-trial conference order. The objection was overruled, and Mr. Kanutson testified as follows. He had become familiar with the heating system in question while working for appellee. He described its design and tests performed on this type of system. After questioning Dr. Hockenberry's definiteness as to the origin of the fire, Mr. Kanutson stated that the damage to the unit was inconsistent with Dr. Hockenberry's theory of a fault in the tubing that caused the heating wire to come in contact with the tube. He explained that since the edges of the fins had melted and the collars of the fins—that part closest to the tube—had not, the intense heat must have had an exterior source. The malfunction described by Dr. Hockenberry would have caused an eruption through the surface of the tube and there was no such eruption in this case. Also, the capillary thermostat would have countered any increase of heat within the tube. On cross-examination Mr. Kanutson admitted that he had not examined the house or performed any tests on the heater, but he said that he based his testimony on the typical result of a fault as described by Dr. Hockenberry and on his own visual examination of the heater in question.

After Mr. Kanutson had finished testifying the trial was recessed until the following Monday. As the jury was being dismissed, the trial judge spoke to counsel:

THE COURT: Mr. Montgomery [counsel for appellants], Mr. McCandless [counsel for appellee] wants to take a couple fins off the undamaged and for a demonstration.

MR. MONTGOMERY: That's all right with me. I want a report of what's going to happen beforehand.

\* \* \* \* \* \*

N.T. 135 VV.

When the trial resumed, appellee called its other expert witness, James Vodenichar, an electrical engineer. Appellants again objected, citing the pre-trial conference order.

The objection was overruled and Mr. Vodenichar testified as follows. In his opinion Dr. Hockenberry's theory was incorrect because the heat would have melted that part of the unit closest to the tube and not just the edges of the fins. In support of this contention, and over appellants' objection, he was permitted to testify concerning an experiment he had performed on the fins obtained on the previous Friday. He testified that he had strung one of the fins over a steel U-bolt and had heated the bolt with a blow torch. The result was that the inner portion of the fins had melted but not the outer edges. He concluded that is was scientifically impossible for the fire to have occurred as described by Dr. Hockenberry. The bolt and the fins were admitted into evidence over appellants' objection.

The jury returned a verdict for appellee, and appellants filed a motion for a new trial. In denying the motion, the lower court stated:

The plaintiffs' motion for a new trial contains 15 reasons of trial error. Even assuming they are good and cogent reasons for a new trial, there is one basic and fundamental gap in this case that precludes relief to the plaintiffs. It arises from the testimony of Dr. Terry Hockenberry, plaintiffs' expert witness.

The defect in this case, as contended by Dr. Hockenberry, was the heating unit in the baseboard heater. A properly constructed unit has a resistor wire, surrounded by insulation. The wire and insulation are encompassed in aluminum tubing. Dr. Hockenberry's theory was that in the unit in question, the resistor wire was improperly installed and came into contact with the aluminum tubing, and this caused the fire. This theory was not based on any examination or testing of the unit, but merely on his vast experience in fire cases and his knowledge of the originations of fire. Insofar as this court is concerned, that was nothing but speculation and conjecture. As an expert he had an obligation to either take this unit apart and verify this finding, or in the alternative, subject the unit to some type of test or examination so that he could

tell the jury whether he found the resistor wire up against the tubing. An X-ray examination or some type of fluoroscopic examination was required to support this theory.

The case was lost when Dr. Hockenberry admitted he did nothing with the unit, retrieved from the destroyed premises, to verify his conclusion that this defective part did indeed start the fire.

Counsel for defendant, in his objections to the expert's testimony, set forth as one of the reasons for objecting to Dr. Hockenberry's testimony that the expert further admitted he did not examine the element in the baseboard heating unit where he said the defect existed. In retrospect, this should have been sustained and with it the motion for a compulsory non-suit.

Lest the appellate court be tempted to afford plaintiffs a second bite of the apple, it may be in order to point out a fact that is *de hors* the record, but is persuasive. The unit was examined and it was discovered that the resistor wire was in proper place and surrounded by the requisite insulation. *The jury made this examination*, and it supplies the knockout punch to Dr. Hockenberry's credibility.

Under these circumstances, I would not disturb the verdict.

Lower Court Opinion at 2–3.

 Thus it will be observed that the lower court refrained from considering appellants' assignments of trial error, instead reversing its own denial of appellee's motion for a non-suit. As a matter of practice this was incorrect, for even if in retrospect a motion for non-suit should have been granted, the insufficiency in the plaintiff's case may be cured by evidence presented during the defendant's case, in which event the error in denying the motion for non-suit is, so far as the plaintiff is concerned, of no consequence. When a motion for non-suit is denied, correctly or incorrectly, and the defendant offers evidence, the decision whether to grant a post-trial motion, either for new trial or judgment n. o. v., must be made on the basis of the entire record. *See Handfinger v. Philadelphia Gas Works*, 439 Pa. 130, 266 A.2d

769 (1970); *Lambert v. P B I Industries*, 244 Pa.Super. 118, 366 A.2d 944 (1976). For purposes of analysis, however, it will be convenient to consider the record as did the lower court and decide whether appellee's motion for non-suit should have been granted.

■ In deciding the propriety of an order granting a motion for non-suit, we are guided by the following principles:

> "On appeal from a compulsory non-suit the plaintiff must be given the benefit of every fact and every reasonable inference of fact arising from the evidence, whether direct or circumstantial, and all conflicts must be resolved in the plaintiff's favor. A compulsory nonsuit may be entered only in a clear case where the facts and circumstances lead unerringly to but one conclusion." *Paul v. Hess Bros.*, 226 Pa.Super. 92, 94–95, 312 A.2d 65, 66 (1973) (citations omitted). In a trespass case, a plaintiff need not exclude every other reasonable possibility that could have caused the accident. "It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability." *Jones v. Treegoob*, 433 Pa. 225, 230, 249 A.2d 352, 355 (1969).
>
> *Cornell Drilling Co. v. Ford Motor Co.*, 241 Pa.Super. 129, 135, 359 A.2d 822, 825 (1976).

Applying these principles, we are persuaded that appellants' evidence was sufficient to withstand a motion for non-suit.

■ In order to be entitled to have their claim in strict liability go to the jury, appellants were only required to make out a prima facie case that appellee's product was defective, that the defect caused the fire, and that the defect existed in the product at the time it entered the market. *See Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975); *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974); Restatement (Second) of Torts, § 402A. Appellants could prove the existence of the defect circumstantially. *See Cornell Drill-*

*ing Co. v. Ford Motor Co., supra; Agostino v. Rockwell Mfg. Co.,* 236 Pa.Super. 434, 345 A.2d 735 (1975); *D'Antona v. Hampton Grinding Wheel Co.,* 225 Pa.Super. 120, 310 A.2d 307 (1973).

■ When appellants are given the benefit of every fact and reasonable inference, and when all conflicts are resolved in their favor, it is apparent that the combined testimony of Dr. Hockenberry and John Brooks showed that the system was installed in the same condition as it was received from appellee, and that the fire was caused by a defect existing in the system when it was installed, specifically, by the heating wire coming into improper contact with the wall of the tube, producing extreme heat. There was no need, in order to make our a prima facie case, for Dr. Hockenberry to produce an X-ray of the tube; his testimony of his visual examination and of the resistance readings of the tube was sufficient. The issue of his theory's correctness, as compared with the theory advanced by appellee's experts, is not before us and was not before the trial judge in the context of a motion for a non-suit, but was for the jury. We therefore decline the lower court's invitation to consider "a fact that is *de hors* the record . . . [and] that supplies the knockout punch to Dr. Hockenberry's credibility." We shall leave credibility to the jury, and confine ourselves to the record. *See McCaffrey v. Pittsburgh Athletic Ass'n,* 448 Pa. 151, 293 A.2d 51 (1972); *Greene v. Liebergott,* 235 Pa.Super. 475, 344 A.2d 501 (1975).

With these preliminary matters decided, it is in order to consider appellants' argument that the trial judge erred in permitting appellee's experts to testify.

■■ Pennsylvania Rule of Civil Procedure 212 provides: In any action the court, of its own motion or on motion of any party, may direct the attorneys for the parties to appear for a conference to consider:

(a) The simplification of the issues;

(b) The necessity or desirability of amendments to the pleadings;

(c) The possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof;

(d) The limitation of the number of expert witnesses;

(e) The advisability of a preliminary reference of issues to a master for findings to be used as evidence when the trial is to be by jury;

(f) Such other matters as may aid in the disposition of the action.

The court may make an order reciting the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and limiting the issues for trial to those not disposed of by admissions or agreements of the attorneys. Such order when entered shall control the subsequent course of the action unless modified at the trial to prevent manifest injustice.

The court may establish by rule a pre-trial list on which actions may be placed for consideration as above provided, and may either confine the list to jury actions or to non-jury actions, or extend it to all actions.

Pa.R.Civ.Pro., No. 212.

These provisions, which are substantially the same as the provisions of Federal Rule of Civil Procedure 16, *see* Goorich Amram § 212.6, are designed to enable the parties and the court to simplify and expedite the trial. *See Kinney v. Sun Oil Co.,* 437 Pa. 80, 262 A.2d 128 (1970); *Deibold v. Summerville,* 207 Pa.Super. 31, 215 A.2d 313 (1965). If the pre-trial conference judge enters an order pursuant to the rule, the order will bind the subsequent course of the trial. *See Pittsburgh Junction R.R. Co. v. City of Pittsburgh,* 352 Pa. 317, 42 A.2d 829 (1945); *Deibold v. Summerville, supra.* The trial judge should hold the parties to the terms of the pre-trial conference order except in those cases where it appears that the order must be modified to prevent manifest injustice.

There appear to be no Pennsylvania cases deciding the question of whether the trial judge must preclude testimony by an expert witness where, as here, the party offering the witness has violated a pre-trial conference order by failing either to identify the witness or to disclose his opinion in advance of trial. The federal courts, however, have had occasion to decide this question under Federal Rule of Civil Procedure 16.

Under Rule 16 it is within the discretion of the trial judge either to allow the witness to testify despite the violation of the pre-trial conference order or to follow the order and preclude the testimony. *See generally Washington Metropolitan Area Transit Authority v. Two Parcels of Land*, 569 F.2d 816 (4th Cir. 1978); *John McShain Inc. v. Cessna Aircraft Co.*, 563 F.2d 632 (3d Cir. 1977); *Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894 (3d Cir. 1977); *Washington Hospital Center v. Cheeks*, 129 U.S.App. D.C. 339, 394 F.2d 964 (1968). To preclude the testimony is a drastic sanction, and if it is not necessary under the facts of the case, an abuse of discretion may be found. *See Meyers v. Pennypack Woods Home Ownership Assn., supra.* It is equally true, however, that if under the facts of the case it is necessary to preclude the testimony, the trial judge should preserve the terms of the pre-trial conference order, *see Burdis v. Texas & Pacific Ry. Co.*, 569 F.2d 320 (5th Cir. 1978); *De Marines v. K L M Royal Dutch Airlines*, 433 F.Supp. 1047 (E.D.Pa.1977), and to permit the testimony in such a case may be reversible error. *See Washington Metropolitan Area Transit Authority v. Two Parcels of Land, supra* (reversible error to allow witness not listed in pre-trial memorandum to testify where witness introduced new concepts and considerations into case with which opposing counsel were unprepared to deal). In *Meyers v. Pennypack Woods Home Ownership Assn., supra*, the Court of Appeals for the Third Circuit set forth the following principles as pertinent to the decision whether to permit or preclude the testimony:

Decisions of this and other courts suggest the factors to be considered in resolving this question: bad faith on the part of the party seeking to call witnesses not listed in his pretrial memorandum; *see Clark v. Pa.R.R. Co.*, 328 F.2d 591 (2d Cir. 1964), *cert. denied*, 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1965); ability of the party to have discovered the witnesses earlier, *see Hunt v. Pa.R.R. Co.*, 41 F.R.D. 349 (E.D.Pa.1967); validity of the excuse offered by the party, *Thompson v. Calmar Steamship Corp.*, 331 F.2d 657, 662 (3d Cir. 1964); willfulness of the party's failure to comply with the court's order, *Taggart v. Vermont Transportation Co.*, 32 F.R.D. 587 (E.D.Pa.1963), *aff'd* 325 F.2d 1022 (3d Cir. 1964); the parties' intent to mislead or confuse his adversary, *Pakech v. American Export Isbrandtsen Lines, Inc.*, 69 F.R.D. 534 (E.D.Pa. 1967); and finally, the importance of the excluded testimony, *Clark, supra.* Underlying the cases to which we have adverted are these basic considerations: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith of willfulness in failing to comply with the court's order.

*Meyers v. Pennypack Woods Home Ownership Assn., supra*, 559 F.2d at 904–05.

■ In this case, the trial judge should have employed a similar analysis. Had the judge done so, it would have been apparent that the two expert witnesses called by appellee should not have been permitted to testify. Nothing suggests any ability on appellants' part to discover before trial either the identity of the witnesses or the substance of their opinions. Appellee offered no excuse for its violation of the pre-trial conference order. Given such a silent record, we will not speculate about what appellee's excuse might have been, if in fact it had an excuse. We will not attribute

appellee's violation of the pre-trial conference order to bad faith, for it was the lower court's error in dismissing appellants' objections without requiring appellee to explain its violations that caused the record to be silent. However, we find it clear that appellee's conduct—both its violation of the pre-trial conference order and its failure to give counsel a copy of the laboratory report—was prejudicial to appellants, for it put appellants in the position of being unable to offer effective rebuttal—or any rebuttal—of appellee's experts. Appellee's conduct was especially prejudicial to appellants in view of the fact that appellants had offered only a video-tape deposition of their expert. It is hardly surprising that the jury rejected the opinion expressed on video-tape, given the contrary opinion expressed by two experts who testified in person, and who were unrebutted.

While precluding a witness from testifying is a drastic sanction, it has been imposed in cases involving similar prejudicial failures to provide notice. See Nissley v. Pennsylvania R.R. Co., 435 Pa. 503, 259 A.2d 451 (1969) (where plaintiff refused to answer interrogatory relating to expert witness it was error to permit witness to testify); see also Moore v. H. P. Foley Co., 235 Pa.Super. 310, 340 A.2d 519 (1975). The present case involves a situation even more compelling than that presented in Nissley because here, unlike in Nissley there was a totally unexplained violation of a direct court order. Had appellee offered a reasonable explanation for its violation of the pre-trial conference order, an accommodation of the parties' respective interests might well have been devised by the trial judge, such as a continuance. On the record here, however, no reason appears for the judge's failure to enforce the order.

Reversed and remanded for new trial.

JACOBS, former President Judge, and PRICE and HOFFMAN, JJ., did not participate in the consideration or decision in this case.