474 A.2d 1172

**Donald F. SWARTZ and Norma H. Swartz, his wife, Appellants,**

**v.**

**GENERAL ELECTRIC COMPANY, Sam Levin Furniture Company**

**v.**

**ROBERTSHAW CONTROLS COMPANY.**

Superior Court of Pennsylvania.

Argued Nov. 30, 1983.

Decided March 23, 1984.

Reargument Denied June 4, 1984.

Barbara Clements, Pittsburgh, for appellants.

Patrick R. Riley, Pittsburgh, for General Electric, appellee.

Michael W. Burns, Pittsburgh, for Levin Furniture, appellee.

William David Geiger, Pittsburgh, for Robertshaw, appellee.

Before ROWLEY, WIEAND and HESTER, JJ.

PER CURIAM:

Appellants, Donald F. Swartz and Norma H. Swartz, his wife, bring this appeal from the granting of compulsory non-suits as to the three appellees.

Our standard of review in an appeal from a compulsory non-suit is as follows:

"On appeal from a compulsory nonsuit the plaintiff must be given the benefit of every fact and every reasonable inference of fact arising from the evidence, whether direct or circumstantial, and all conflicts must be resolved in the plaintiff's favor. A compulsory nonsuit may be entered only in a clear case where the facts and circumstances lead unerringly to but one conclusion." *Paul v. Hess Bros.*, 226 Pa.Super. 92, 94–95, 312 A.2d 65, 66 (1973) (citations omitted). In a trespass case, a plaintiff need not exclude every other reasonable possibility that could have caused the accident. "It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability." *Jones v. Treegoob*, 433 Pa. 224 [225], 230, 249 A.2d 352, 355 (1969). *See also Cornell Drilling Company v. Ford Motor Company*, 241 Pa.Super. 129, 135, 359 A.2d 822, 825 (1976).

Employing this standard, the evidence elicited at trial established the following:

On December 12, 1973, Mr. Swartz began cooking oxtail soup on the range manufactured by appellee General Electric. The range had been purchased from appellee Sam Levin Furniture on February 13, 1973, and was under a one year warranty from General Electric. Mr. Swartz started the cooking process at approximately 1:45 to 2:00 p.m. planning to permit the soup to come to a hard boil and then to simmer for an additional four to five hours or until "tender."

At approximately 2:40 p.m., the Swartzes left their home. Prior to leaving, Mr. Swartz checked the soup and found it to be simmering properly. Mr. Swartz also indicated that he had on many previous occasions left the oxtails on simmer and had left the residence.

Sometime between 3:30 to 4:00 p.m. on this day, James Fox, the Assistant Fire Chief for the New Stanton Volun-

teer Fire Company, spotted smoke rising from the direction of the Swartzes' residence. Mr. Fox then proceeded to the residence and upon arrival, observed that the residence was engulfed in smoke.

After the fire was extinguished, Mr. Fox returned to the dwelling to make an inspection. He found the family room and the kitchen to be almost completely destroyed while the remainder of the house was charred except for the basement which had been virtually untouched.

Carl Metz, a fire investigator for the Pennsylvania State Police, also investigated the fire. Trooper Metz testified that he had been a fire investigator for approximately twenty-one years and that during this time taught at several fire schools. Upon completing his investigation, Trooper Metz made the following conclusions:

"The fire in incident is believed to have started in the first floor kitchen of the one to two story log framed house and then spread from that area to the complete first floor of the house. This house originally was a two-story log cabin-type house, and is presently a one-story frame with aluminum siding section added along with a carport. The house was heated with a fuel oil furnace which was located in the basement. A complete house and antique furniture had been recently gone over. [sic]

A check was made of the wiring and it was found to be in good condition. There was signs of shortening of wiring in the kitchen and the living room. [sic] The fuses in the fuse box were checked and found to be blown, and in the back were signs of arcing. Holes in the area of the floor above the hot water tank and burned down through the floor and not up through the floor. [sic]

Another thing was found on the electric range had been on at the time of the fire. [sic] A hole was burned through in front of the electric range down through the floor, and all the shelves burned off above the electric range were in the area of the range."

Appellants' final witness was Timothy Pudlo. Mr. Pudlo, an electrical nuclear and aerospace engineer, had been employed by Pittsburgh Testing Laboratories for ten years. Prior thereto, his employment record included service with Bendix Corporation as a guided missile engineer, and at Westinghouse as an aerospace and nuclear engineer. Also, during employment with Pittsburgh Laboratories, Mr. Pudlo worked as a manufactured electrical wiring inspector and in this role had examined and tested the electrical wiring in ranges so as to insure their safety. In addition, Mr. Pudlo's employment experience encompassed the investigation of fires, their origins, and causes. Mr. Pudlo is a registered engineer in Pennsylvania and Illinois, and is a member of the Institute of Electric and Electronic Engineers and the National Fire Protection Association.

Appellants' trial counsel, so as to elicit an expert opinion as to the origin of the fire, asked the following hypothetical question based upon facts adduced from the appellants' prior witnesses:

Q. Mr. Pudlo, I'm going to rephrase the hypothetical question I've asked you and change a few of the facts that I'd like you to assume. Would you please assume the following sets of facts please: The Swartz home caught on fire December 12, 1973, between 2:40 p.m. and 4:39 p.m. The Swartzes' home was a residential building of log construction with a frame addition. The frame addition contained interior wooden paneling and exterior aluminum siding. That no one was in the Swartzes' home when the fire occurred. That a pot of oxtail soup was on the low setting on the back right burner of the Swartzes' electric range when the Swartzes left their house at 2:40 p.m. that day.

That the range in use had been purchased and installed less than ten months before the fire. That the electric range was plugged into a 220 volt outlet that had been used by the Swartzes for electric ranges for 23 years. That the electric range's back was against an exterior log wall, and to the left of the electric range is an exterior log

wall. There was a wood floor with a linoleum surfacing, and to the right was a counter top followed by a sink, and above the electric range was a cabinet. Also, assume, please, that the only hole burnt through the first floor of the flooring by the fire was located a few feet in front of the range, and that hole was burned from the first floor downward. That the only hole burned through the log walls of the house was a hole in the exterior kitchen wall behind the electric range at the same height of the electric range and burning from the interior of the house outward.

That there was no fire damage to the electric hot water tank and oil furnace. That the hot water tank and furnace were located in the basement and subsequently used in the new house used and built by the Swartzes after the fire. That the wiring in the stove which you've examined was wrapped in mineral insulation and copper wiring that you've examined had melted balls at various ends that formed into molten copper.

Based on those assumptions of fact, Mr. Pudlo, are you able to form within a reasonable degree of scientific certainty as to the origin of the fire in the Swartzes' residence? [sic]

A. Upon Mr. Pudlo's affirmative response, the following discourse ensued:

Q. Would you please tell us what your opinion is as to the origin of the fire?

A. The origin of the fire was in the vicinity of the range, and its cause was from the inside of the range outward of an electrical origin. [sic]

Q. Would you please explain what caused the fire?

A. From the holes burnt through the walls, I surmised that the origin was in the vicinity of the range. That would be the hottest part of the fire where it was burning for the longest period of time. So it had time to heat through the walls and floors around the area of the range. From the mineral insulation, I concluded that in previous observations in fires that that doesn't degrade

completely inside a normal combustible fire. If there were oxygens or acetylene or some very fancy fire, I would expect that to degrade rapidly. But I see mineral insulation get through an ordinary combustible fire. [sic]

I also found the copper balls. From that I deduced that that was caused by electric origin. That's about the only thing hot enough around that area to melt the copper. Normal combustibles don't get that hot in an ordinary fire. So there was some sort of short-circuit in that area that caused the copper balls to melt, and that was not caused by the fire because the mineral insulation would have survived from a normal fire.

If it was laying out, the plastic may have burned and that may have resulted as the cause of the fire, but I concluded that it occurred before the whole house was burning because of this mineral insulation. It didn't go during a normal combustible fire.

In continued questioning, Mr. Pudlo stated that from his observation and findings, the short-circuit which caused the fire was on the supply side of the range switch, meaning the plug wire running from the wall outlet to the outlet on the range. However, this testimony was stricken upon objection. In justifying its sustaining of this objection, the lower court asked the following questions of Mr. Pudlo:

THE COURT: Incidentally, did you ever see that range? I mean the actual one in the kitchen.

MR. PUDLO: Yes.

THE COURT: Did you look inside of it.

THE WITNESS: Yes.

THE COURT: All right. Did you look at every wire, every nut, every bolt, every part of the circuits of the range system?

THE WITNESS: Not every one individually, no.

THE COURT: Whatever you looked at, did you find anything that was wrong with it—not what you found after the fire, but did you find a broken wire? Did you find wires with no insulation on it? As what you say would cause a short-circuit?

THE WITNESS: No, I didn't.

Appellants' Trial Counsel:

Q. What did you find, Mr. Pudlo?

A. I found wires with melted ends that indicated to me that there was some sort of short-circuit inside that range or a big dissipation of energy that shouldn't have been there.

Q. What would create that energy?

THE COURT: You've already been over that half dozen times. (Referring to the fact that the Court would not allow Mr. Pudlo to testify as to the location of the short).

The lower court also prohibited Mr. Pudlo from testifying as to whether the range was defective when sold or at the time of the fire. The trial court, in disallowing this testimony, stated that these are the ultimate issues in the case, and as such are the exclusive province of the jury.

■■■ In order to have their claim in strict liability submitted to the jury, appellants were required only to make out a prima facie case that the range was defective, that the defect caused the fire, and that the defect existed in the product at the time it entered the market. *See Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975); *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974); *Gill v. McGraw Electric Company*, 264 Pa.Super. 368, 399 A.2d 1095 (1979). *Restatement (Second) of Torts*, § 402A. Appellants could prove the existence of the defect circumstantially. *See Cornell Drilling Co. v. Ford Motor Company*, 241 Pa.Super. 129, 359 A.2d 822 (1976); *Agostino v. Rockwell Mfg. Co.*, 236 Pa.Super. 434, 345 A.2d 735 (1975); *D'Antona v. Hampton Grinding Wheel Co.*, 225 Pa.Super. 120, 310 A.2d 307 (1973).

■■■ As our review of the evidence indicates, when appellants are given the benefit of every fact and reasonable inference, a jury could properly find that the fire which partially destroyed the Swartzes' home was caused by a short-circuit which occurred in the plug wire that ran from the electric outlet to the range's control panel. From the

melted ends of the wires which he found upon his examination of the range, Mr. Pudlo concluded that a large dissipation of energy took place in the range itself which would not have occurred if the fire had originated in any place other than the range. Also, Mr. Pudlo was able to indicate that the short-circuit occurred on the supply side of the switch, meaning from the wall-plug wire to the dial controls on the range. The lower court granted a motion to strike this testimony based upon the fact that Mr. Pudlo had not examined these wires. However, Mr. Pudlo indicated that he had examined the range itself and we do not have any indication as to its availability following the fire. Furthermore, Mr. Pudlo indicated that it was not necessary that he examined this plug wire, for the circuitry inside the range indicated that the short-circuit occurred in the supply side of the range, that is, the plug wire.

In *Gill v. McGraw Electric Company*, 264 Pa.Super. 368, 399 A.2d 1095 (1979), we were confronted with a factual situation very similar to the present case. In denying the plaintiffs' motion for a new trial, the trial court stated:

"The plaintiffs' motion for a new trial contains 15 reasons of trial error. Even assuming they are good and cogent reasons for a new trial, there is one basic and fundamental gap in this case that precludes relief to the plaintiffs. It rises from the testimony of Dr. Terry Hockenberry, plaintiffs' expert witness.

The defect in this case, as contended by Dr. Hockenberry, was the heating unit in the baseboard heater. A properly constructed unit has a resistor wire, surrounded by insulation. The wire and insulation are encompassed in aluminum tubing. Dr. Hockenberry's theory was that in the unit in question, the resistor wire was improperly installed and came into contact with the aluminum tubing, and this caused the fire. This theory was not based on any examination or testing of the unit, but merely on his vast experience in fire cases and his knowledge of the origination of fire. Insofar as this court is concerned, that was nothing but speculation and conjecture. As an

expert he had an obligation to either take this unit apart and verify this finding, or in the alternative, subject the unit to some type of test or examination so that he could tell the jury whether he found the resistor wire up against the tubing. An X-ray examination or some type of fluoroscopic examination was required to support this theory.

The case was lost when Dr. Hockenberry admitted he did nothing with the unit, retrieved from the destroyed premise, to verify his conclusion that this defective part did indeed start the fire.

Counsel for defendant, in his objections to the expert's testimony, set forth as one of the reasons for objecting to Dr. Hockenberry's testimony that the expert further admitted he did not examine the element in the baseboard heating unit where he said the defect existed. In retrospect, this should have been sustained and with it the motion for a compulsory non-suit.

Lest the appellate court be tempted to afford plaintiffs a second bite of the apple, it may be in order to point out a fact that is de hors the record, but is persuasive. The unit was examined and it was discovered that the resistor wire was in proper place and surrounded by the requisite insulation. The jury made this examination, and it supplies the knockout punch to Dr. Hockenberry's credibility.

Under these circumstances, I would not disturb the verdict. Lower Court Opinion at 2–3."

*Gill, supra* 264 Pa.Super. at 376–77, 399 A.2d at 1099–1100.

In reversing the lower court's conclusion that the appellants' expert testimony was insufficient to withstand the defendant's motion for non-suit, we stated:

"When appellants are given the benefit of every fact and reasonable inference, and when all conflicts are resolved in their favor, it is apparent that the combined testimony of Dr. Hockenberry and John Brooks showed that the system was installed in the same condition as it was received from appellee, and that the fire was caused by a defect existing in the system when it was installed,

specifically, by the heating wire coming into improper contact with the wall of the tube, producing extreme heat. There was no need, in order to make out a prima facie case, for Dr. Hockenberry to produce an X-ray of the tube; his testimony of his visual examination of the resistance readings of the tube was sufficient. The issue of his theory's correctness, as compared with the theory advanced by appellee's experts, is not before us and was not before the trial judge in the context of a motion for a non-suit, but was for the jury. We therefore decline the lower court's invitation to consider "a fact that is de hors the record ... [and] that supplies the knockout punch to Dr. Hockenberry's credibility." We shall leave credibility to the jury, and confine ourselves to the record. *See McCaffrey v. Pittsburgh Athletic Ass'n.*, 448 Pa. 151, 293 A.2d 51 (1972); *Greene v. Liebergott*, 235 Pa.Super. 475, 344 A.2d 501 (1975)." (emphasis added).

*Gill, supra,* 264 Pa.Super. at 379, 399 A.2d at 1101.

We, as did the Court in *Gill, supra,* conclude that it was not necessary for Mr. Pudlo to examine the plug wire, (if it was available after the fire), so as to make out a prima facie case. His testimony as to his inspection of the wiring in the range and the results of that inspection, combined with Trooper Metz's and Mr. Pudlo's findings as to the origin of the fire, were sufficient. The correctness of Mr. Pudlo's theory, as compared with any advanced by appellees' experts is strictly for jury resolution.

The trial court also advanced as a reason for granting appellees' motions for compulsory nonsuits that appellants did not eliminate the cooking of the oxtail soup as a reasonable secondary cause of the fire. Upon our review of the record, we find that appellants did present testimony that Mr. Swartz had on many previous occasions followed the same procedures for cooking that he had that day and then left the house specifically, first, having the oxtail soup come to a boil, then lowering the dial control to simmer, and finally checking the water before leaving his residence to ensure that the large pot was over half filled with water.

Clearly, appellants had placed sufficient evidence into the record to enable the jury to say reasonably that the preponderance of the evidence favors liability. As we have stated in *Cornell Drilling Company, supra,* 241 Pa.Super. at 135, 359 A.2d at 825, in a trespass case:

"a plaintiff need not exclude every reasonable possibility that could have caused the accident. It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability." *Jones v. Treegoob,* 433 Pa. 225, 230, 249 A.2d 352, 355 (1969).

■ The final issue which we must examine in determining whether the compulsory non-suits should have been granted is whether appellants submitted sufficient evidence to establish that the alleged short-circuit on the supply side of the range was caused by a defect in the range which existed at the time of its sale to appellants ten months prior to the fire. As held by our Supreme Court, the plaintiff must prove that the defect causing the injury was present at the time the product left the seller's hands. *See Bialek v. Pittsburgh Brewing Co.,* 430 Pa. 176, 242 A.2d 231 (1968). *See also; Restatement (Second) of Torts,* § 402A(1)(b).

Mr. Pudlo stated that from the evidence adduced at trial, and his personal inspection, he could form an opinion with a reasonable degree of scientific certainty as to whether the Swartzes' range was defective when it was sold to the Swartzes. However, the trial court did not permit Mr. Pudlo to testify as to his opinion on this ultimate issue in the case.

In *Lewis v. Mellor,* 259 Pa.Super. 509, 522, 393 A.2d 941, 948 (1978), we adopted Rule 704 of the Federal Rules of Evidence which provides:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

In establishing this law, we also determined that the lower court would not be reversed in ruling upon the admissibility of testimony to the ultimate issue in the case unless the trial court had clearly abused its discretion and actual prejudice had occurred. *Lewis v. Mellor,* 259 Pa.Super. 509, 393 A.2d 941 (1978).

In the present instance, opinions by experts as to the origin of the fire and whether a defect existed in the range at the time of its purchase are of utmost importance to the jury's proper resolution of the case due to the complexity of the electric wiring of a range. We have stated that circumstantial evidence such as the occurrence of the fire a relatively short time following the purchase, as in the present case where the fire occurred while the range was still under warranty, may permit the inference that the product was defective when it was purchased. However, one can be insured of a more informed and reasoned verdict if experts are permitted to state their conclusion when a complex issue, such as the one in the present case, is involved. Very few jurors would possess any knowledge as to whether the condition which caused a short-circuit to occur ten months following the purchase of the range would have been present at the time of purchase. Any argument that the jury would place undue emphasis on the opinion of the expert witness is refuted by the fact that if the opinion is not supported by the facts, this may be pointed out by cross-examination and argument, and the jury persuaded to reject the opinion. *See* Ladd, *Expert Testimony,* 5 Vand.L. Rev. 414, 415–17 (1952). *See also, Lewis v. Mellor, supra,* 259 Pa.Super. at 521, 393 A.2d at 948.

Thus, we conclude that Mr. Pudlo's expert testimony as to whether the short-circuit was present at the time of the range's purchase from appellee Sam Levin Furniture should have been admitted and therefore there is no question that appellants would have established a prima facie case.

Reversed and remanded for a new trial.