520 A.2d 876

**Rebecca DION, Executrix of the Estate of Lewis Dion, Deceased, Appellant,**

v.

**The GRADUATE HOSPITAL OF the UNIVERSITY OF PENNSYLVANIA, Abbott Laboratories, Dr. William Blakemore, Samuel Burke, et al.**

Superior Court of Pennsylvania.

Argued Sept. 17, 1986.

Filed Jan. 30, 1987.

418

Fred Lowenschuss, Philadelphia, for appellant.

Albert Piccerilli and Robert Mulhern, Philadelphia, for appellees.

Before CIRILLO, President Judge, and MONTEMURO and JOHNSON, JJ.

CIRILLO, President Judge:

Rebecca Dion, Executrix of the Estate of Lewis Dion, appeals from a final judgment of the Court of Common Pleas of Philadelphia County.

In 1972, appellant, Rebecca Dion, instituted a wrongful death and survival action. She alleged medical malpractice and product liability claims arising from the administration of "Penthrane" anesthesia to her husband during surgery. Appellant's husband, Lewis Dion, died as a result of acute peritonitis caused by renal failure due to Penthrane toxicity.

Initially, more than fifty defendants were named in this suit. At the time of trial, as the result of settlements and other dispositions, four defendants remained: Abbott Laboratories (Abbott), the manufacturer of Penthrane; Dr. Blakemore, the surgeon; Dr. Stone, the anesthesiologist,

and Mr. Burke, a nurse anesthetist. At the close of appellant's case, the court granted a non-suit in favor of Abbott Laboratories. The jury returned a verdict in favor of Dr. Blakemore and Mr. Burke and against Dr. Stone. Subsequently, appellant's motion for a new trial was denied.

On appeal, appellant alleges the following: (1) the trial court erred in granting a non-suit in favor of Abbott Laboratories; (2) the trial court erred in excluding appellant's proposed expert witness testimony against Abbott Laboratories; and (3) the preparation and trial of appellant's case were prejudiced by the trial court's erroneous rulings regarding pretrial discovery and its refusal to impose sanctions against Abbott Laboratories for willful destruction of documents.

We note first that appellee Dr. Blakemore filed a motion to dismiss the appeal as to him because no claims were pursued against him on this appeal. The motion was denied without prejudice to raise the issue in briefs and at argument.

Pennsylvania Rule of Appellate Procedure 2116(a) provides in part:

> The statement of the questions involved must state the question or questions in the briefest and most general terms ... [and] ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby.

Appellant's brief raised three issues regarding her claim against Abbott. No mention of appellee Dr. Blakemore is made. We find that appellant has not carried forward in her brief any claim against Dr. Blakemore, and therefore any claims against him are waived. *See Commonwealth v. Whiteman*, 336 Pa.Super. 120, 485 A.2d 459 (1984) (ordinarily when Superior Court decides issues on appeal, it restricts itself to the statement of questions involved in the appellant's brief for a definition of the issues to be decided).

## I

Appellant first raises the question of whether the trial court properly granted a non-suit in favor of Abbott. Be-

fore we address this issue, it is necessary to explain the basis of the trial court's action.

## A.

Appellant's primary theory of liability was Abbott's failure to adequately warn of the dangers of Penthrane in its package insert. Mrs. Dion alleged that she introduced evidence of Abbott's own documents showing that the use of Penthrane was contraindicated in a patient such as Lewis Dion, and that Abbott failed to give such a warning. Specifically, appellant alleged that Mr. Dion had a history of elevated B.U.N. (blood urea nitrogen) and creatinine levels, and the package insert failed to adequately warn of the dangers of Penthrane to patients with such a history.

Abbott's Penthrane warnings in the package insert cautioned as follows:

**WARNINGS**

INSTANCES OF TUBULAR DYSFUNCTION, ESPECIALLY HIGH OUTPUT RENAL FAILURE, SOMETIMES LEADING TO DEATH, HAVE BEEN REPORTED. (SEE ALSO ADVERSE REACTION.) THE MECHANISM WHEREBY PENTHRANE MAY CAUSE RENAL DYSFUNCTION IS NOT KNOWN. HOWEVER, THERE APPEARS TO BE A RELATIONSHIP TO TOTAL DOSAGE. SPECIAL CARE TO AVOID UNNECESSARILY DEEP ANESTHESIA IS REQUIRED, ESPECIALLY IN AGED OR OBESE PATIENTS, AND IN SURGICAL PROCEDURES OF LONG DURATION, AND DURING ASSISTED OR CONTROLLED VENTILATION. IT SHOULD BE APPRECIATED THAT ABSENCE OF HYPOTENSION CANNOT BE RELIED UPON AS EVIDENCE THAT DOSAGE HAS NOT BEEN EXCESSIVE. OTHER SIGNS SHOULD BE USED AS A GUIDE TO PROPER DOSAGE. (SEE DOSAGE AND ADMINISTRATION.)

ALL PATIENTS WHO RECEIVE PENTHRANE (METHOXYFLURANE) SHOULD BE MONITORED FOR URINARY OUTPUT AND POSSIBLE LABORATORY

SIGNS OF RENAL DYSFUNCTION. AS INDICATED, LOSSES OF FLUIDS AND ELECTROLYTES IN URINE OR BY OTHER ROUTES SHOULD BE PROMPTLY REPLACED.

WHEN IMPAIRED RENAL FUNCTION IS PRESENT PREOPERATIVELY THE BENEFITS–TO–RISK RATIO MUST BE CAREFULLY WEIGHED IN ARRIVING AT THE JUDGMENT TO EMPLOY PENTHRANE, AND SERIAL TESTS OF RENAL FUNCTION AND FLUID-ELECTROLYTE STATUS SHOULD BE OBTAINED SO THAT SPECIAL MEASURES TO OFFSET EMERGING DEFICITS CAN BE EFFECTED EARLY IN THEIR COURSE.

CONCURRENT USE OF TETRACYCLINE AND METHOXYFLURANCE HAS BEEN REPORTED TO SERIOUSLY IMPAIR RENAL FUNCTION LEADING TO DEATH....

**ADVERSE REACTIONS**

Hepatic dysfunction and fatal hepatic necrosis following PENTHRANE, (methoxyflurane) anesthesia have been reported.

Renal PENTHRANE anesthesia. This reaction is characterized by the development early in the postoperative period of a large flow of urine of low, relatively fixed specific gravity, with a volume equivalent to or in excess of the fluid intake. This usually results in a negative fluid balance, pronounced weight loss, and elevation of serum sodium, serum chloride, osmolality, and blood urea nitrogen, and uric acid.

Autopsy revealed oxalate crystals and/or acute tubular necrosis in several patients who died of varying causes after the administration of PENTHRANE.

Some patients exhibit an unexplained pallor during recovery from deeper planes of PENTHRANE anesthesia.

Other adverse reactions that have been reported include: cardiac arrest, malignant hyperpyrexia, prolonged postoperative somnolence, respiratory depression, laryn-

gospasm, bronchospasm, nausea, vomiting, postoperative headache, hypotension, and emergence delirium.

As our Supreme Court stated in *Incollingo v. Ewing*, 444 Pa. 263, 288, 282 A.2d 206, 220 (1971): "[where] the drug [is] available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." In *Incollingo*, the question was whether the drug company had properly warned physicians of the dangers of Chloromycetin. The court found this question was properly before the jury. Following the testimony of various experts, the jury concluded that the company had failed to give an adequate warning.[1]

In the instant case, appellant failed to comply with discovery, resulting in sanctions precluding the use of expert testimony against Abbott. In light of appellant's failure to present expert testimony establishing that Abbott's warnings were inadequate, the trial court granted Abbott's motion for a nonsuit. In reaching this conclusion, the trial court considered the fact that Penthrane was a prescription drug used to anesthetize individuals during surgery. The court reasoned that only physicians or others with similar education and experience regarding prescription drugs would be qualified to testify as to the adequacy of the warning.

### B.

When a compulsory non-suit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. *Kelly v. Doran*, 312 Pa.Super. 286, 458 A.2d 962 (1983). To justify the granting of a non-suit, it must appear from the plain-

---

1. A distinctive form of warning is that which informs the physician of potential risks or side effects which may foreseeably follow the use of the drug. *See* Twerski, et al., *The Use and Abuse of Warnings in Products Liability-Design Defect Litigation Comes of Age*, 61 Cornell L.Rev. 495, 520–21 (1976); Keeton, *Products Liability-Inadequacy of Information*, 48 Texas L.Rev. 398 (1970); Rheingold, *Products Liability-The Ethical Drug Manufacturer's Liability*, 18 Rutgers L.Rev. 947 (1964).

tiff's statement of his case that there is a complete absence of evidence legally sufficient to maintain the action. *Stone & Webster Eng. v. Heyl & Patterson, Inc.*, 261 Pa.Super. 150, 395 A.2d 1359 (1978). Here, the trial court concluded that in the absence of expert testimony, the plaintiff's evidence was legally insufficient to maintain an action against Abbott based on inadequate warnings.

In order to review the propriety of the court's conclusion, we must consult the law of products liability. As we stated in *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 57, 485 A.2d 408, 426 (1984):

> [T]here are difficulties in thinking of an inadequate warnings case as a products liability case. Products liability cases fall into two categories: Manufacturing defect cases and defective design cases. In a manufacturing defect case, the question whether the product is defective is relatively simple. Since the allegation is that something went awry in the manufacturing process ... the finder of fact need only compare the product that caused the injury with other products that were manufactured according to specifications. In a defective design case, however, the question is whether the product should have been designed more safely. While an inadequate warnings case has been characterized as a kind of defective design case, *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), the term "defective" does not easily fit when applied to warnings. For in a warnings case it is not alleged that there was anything wrong with the product's *design as such.* Rather, a "defect" is supposed to exist because the user was not adequately instructed on *how to use* the product *as the product was designed.*

*Id.* (emphasis in original).

In a products liability case, the plaintiff must prove that (1) the product was defective; (2) the defect caused the injury; and (3) in manufacturing or supplying the product the defendant failed to exercise due care. *Dambacher*, 336 Pa.Super. at 53, 485 A.2d at 424. *See also Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983).

■ In *Dambacher*, the court pointed out that the way to overcome the possible misunderstanding of the term "defective" is to explain to the jury that it is to consider whether the product was safe in the absence of warnings or in light of the warnings that were given. *Dambacher*, 336 Pa.Super. at 57, 485 A.2d at 426.[2] Here, the trial court ruled that based on appellant's failure to present expert testimony, a jury would be unable to make a determination of whether or not the product (Penthrane) was defective. That is, absent expert testimony, the jury would be unable to make a determination as to whether or not the warnings were adequate. We agree with the trial court's reasoning. Based on our review of the warning on Abbott's package insert, and applying the principles set forth above, we find that in the instant case the trial court properly concluded that expert testimony was necessary. Without expert testimony, there is a complete absence of evidence to show that the warning was inadequate. Thus, a conclusion that the product was defective could not reasonably or properly be reached by the jury. This is simply not the situation where there is no warning or where the inadequacy of the warning is obvious. *Gallegor by Gallegor v. Felder*, 329 Pa.Super. 204, 478 A.2d 34 (1984). Therefore, we find no basis to reverse the trial court's grant of a non-suit in favor of Abbott.

## C.

Although appellant does not specifically raise the issue of whether expert testimony is *required* to determine the adequacy of a drug manufacturer's warning when that warning is to the medical community, we feel it is necessary to address this question in order to thoroughly dispose of

**2.** The source of the confusion to which the *Dambacher* court refers is the injection of both negligence principles and strict liability principles in products liability cases. *See Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978); *Berkebile v. Brantly Helicopter Co.*, 462 Pa. 83, 337 A.2d 893 (1975); *Salvador v. Atlantic Boiler Co.*, 457 Pa. 24, 319 A.2d 903 (1974); *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966).

this appeal. In addition, we note the trial court's request for clarification.

Expert testimony is admissible when it involves explanations and inferences not within the ordinary training, knowledge and experience of the jury. *Pirches v. General Acc. Ins. Co.*, 354 Pa.Super. 303, 511 A.2d 1349 (1986).

Frequently, the jury, or the court trying a case without a jury, is confronted with issues which require scientific or specialized knowledge or experience in order to be properly understood. Certain questions cannot be determined intelligently merely from the deductions made and inferences drawn from practical experience and common sense. On such issues, the testimony of one possessing special knowledge or skill is required in order to arrive at an intelligent conclusion. 31 Am.Jur.2d *Expert and Opinion Evidence* § 16 (1967). In these matters, where laymen have no knowledge or training, the court and jury are dependent on the explanations and opinions of experts.

In a logical and fundamental sense, a verdict is worth only as much as the evidence upon which it is based. In a complex case, a jury, in order to reach an intelligent conclusion, is dependent on expert testimony. If the jury is enlightened, it will reach the right verdict. Unaided by the explanations and opinions of those with specialized knowledge or skill, the ultimate conclusion might just as well be based on evidence presented in a language unfamiliar to the jury. Unless the jury is comprised of experts in the field, the verdict is based on mere conjecture. Such a verdict is worthless.

■ Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. The terms and applications of a warning on such a drug, in order to have meaning, must be explained to the jury. This is a subject "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." McCormick on Evidence 33 (E. Cleary,

3d ed. 1984). Thus, we hold that in a complex products liability action such as this, expert testimony is required to determine whether the drug manufacturer's warning to the medical community is adequate.

■ We caution that our holding here is limited to those cases in which the meaning of the warning eludes the comprehension of an ordinary layperson. Where any layperson can understand the insufficiency of a warning, expert testimony is not necessary. It is for the trial court to limit this requirement to the bounds of necessity.

## II

Appellant's second allegation of error concerns the propriety of the trial court's order precluding expert testimony against Abbott.

On July 19, 1978, appellant was served by Abbott with expert interrogatories, and on October 13, 1982, the Honorable Bernard Snyder ordered appellant to answer the interrogatories within twenty days. Appellant failed to respond. On December 30, 1982, Abbott moved for sanctions. On April 12, 1983, the trial court, per Judge Snyder, issued the following order: "Defendant's Motion for Sanctions for Failure of Plaintiff to Answer to Expert Interrogatories is hereby granted. Plaintiff must file Answers to Expert Interrogatories within thirty (30) days or be precluded from presenting expert testimony at the time of trial...." Appellant failed to comply with this order and expert testimony against Abbott was precluded.

However, on October 18, 1984, two weeks prior to trial, Abbott's counsel received from appellant the report of Seymour Shotz, M.D. On November 5, 1985, the first day of trial, appellant submitted to Abbott the report of Nebojsa Andolovic, M.D. Appellant proposed to have both of these physicians present expert testimony against Abbott with respect to the alleged inadequate warnings. Both of these

experts were precluded from testifying. In addition, the trial court precluded defendants Burke, Stone and Blakemore from testifying as experts against Abbott.[3]

■ The Pennsylvania Rules of Civil Procedure provide for discovery of expert witnesses and their opinions. *See* Pa.R.Civ.P. 4003.5. Appropriate sanctions may be imposed for failure to comply with discovery requests, including the exclusion of expert testimony after failure to disclose the identity of expert witnesses and the nature of their testimony. Rule 4003.5 provides in pertinent part:

(b) If the identity of an expert witness is not disclosed in compliance with subdivision (a)(1) of this rule, he shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

Pa.R.Civ.P. § 4003.5(b). In *Kaminski v. Employers Mutual Casualty Co.*, 338 Pa.Super. 400, 487 A.2d 1340 (1985), this Court held that absent extenuating circumstances, Rule 4003.5(b) is a rule of mandatory preclusion. *Id.*, 338 Pa.Superior Ct. at 407, 487 A.2d at 1344. *See also Brophy by Brophy v. Brizuela*, 358 Pa.Super. 400, 517 A.2d 1293 (1986). In granting Abbott's motion for sanctions, the trial court relied on Pa.R.Civ.P. 4019, which provides in relevant part as follows:

Rule 4019. Sanctions

(a)(1) The court may, on motion, make an appropriate order if

. . . .

---

**3.** We agree with appellant that defendants Burke, Stone, and Blakemore are fact witnesses, and not expert witnesses. This does not, however, alter the trial court's disposition. Their testimony could not be considered expert in nature, and thus appellant would still be without evidence legally sufficient to maintain her action against Abbott.

(i) a party fails to serve answers ... to written interrogatories.

. . . .

(viii) a party or person otherwise fails to make discovery or to obey an order of court respecting discovery.

. . . .

(c) The court, when action under subdivision (a) of this rule, may make

. . . .

(2) an order ... prohibiting [the disobedient party] from introducing in evidence designated documents, things or testimony ...

The imposition of sanctions is within the discretion of the trial court. *Pompa v. Hojnacki,* 445 Pa. 42, 281 A.2d 886 (1971); *Crance v. Sohanic,* 344 Pa.Super. 526, 530, 496 A.2d 1230, 1232 (1985). In practice, however, sanctions for failure to respond to discovery requests are generally not imposed until there has been a refusal to comply with a court order directing compliance. *See, e.g., Griffin v. Tedesco,* 355 Pa.Super. 475, 513 A.2d 1020 (1986); *Simpson v. Allstate Ins. Co.,* 350 Pa.Super. 239, 504 A.2d 335 (1986); *Miller Oral Surgery, Inc. v. Dinello,* 342 Pa.Super. 577, 493 A.2d 741 (1985); *Brunetti v. Southeastern Pennsylvania Transportation Authority,* 329 Pa.Super. 477, 478 A.2d 889 (1984). Here, Mrs. Dion not only failed to answer written interrogatories, but she violated a court order directing her to do so.

In addition, the four factors we outlined in *Gill v. McGraw Electric Co.,* 264 Pa.Super. 368, 382, 399 A.2d 1095, 1102 (1979), can be of some aid in this determination: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) bad faith or willfulness

in failing to comply with the court's order. We are satisfied that the trial court properly found these four factors weighed in Abbott's favor.

■ We recognize that the preclusion of expert testimony is a drastic sanction, especially where, as here, it would effectively prevent a party from prevailing on her claim. Nonetheless, we cannot ignore appellant's failure, for over ten years, to comply with discovery. Nor can we ignore a violation of a court order. Given the circumstances, we conclude that the trial court did not abuse its discretion.

### III

Finally, appellant contends that the trial and preparation of her case were prejudiced by the court's pretrial discovery rulings and its refusal to impose sanctions against Abbott. Appellant alleges that Abbott failed to comply with discovery and that Abbott deliberately and systematically destroyed records pertaining to other lawsuits against Abbott.

■ The trial court reviewed Abbott's answers and supplemental answers to interrogatories and deposition testimony of Abbott's claims manager, Mr. Nesci. The court concluded that Abbott had sufficiently complied with discovery. In addition, the court found that Abbott's "document retention program" did not amount to willful destruction of documents. We agree with the trial court, and find the record devoid of evidence supporting appellant's allegations. We find no abuse of the court's discretion in its decision not to impose sanctions against Abbott. *Hoffman v. Memorial Osteopathic Hospital*, 342 Pa.Super. 375, 492 A.2d 1382 (1985).

AFFIRMED.

MONTEMURO, J., joins CIRILLO, President Judge, except for Section I–C.