## Moosic Lakes Club *v.* Gorski, Appellant.

Argued January 5, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

*Paul A. McGlone,* for appellants.

*James G. Colleran,* for appellee.

OPINION BY MR. JUSTICE BOK, March 13, 1961:

This case involves the struggle to control a non-commercial lakeside club in Lackawanna County.

Two men, McLaughlin and Bissell, were the original owners and developers of 3000 acres of land surrounding two small lakes in Jefferson Township. These men created The Moosic Lakes Club, a corporation of the first class, in 1941 for the purpose of promoting the development of the property, and gave to it as a gift two lakes, a strip of land around them, a commons, and a baseball field. A corporation of the second class, known as Moosic Lakes, Inc. was incorporated in 1947. Hereafter we will refer to them as the Club and the company. By 1958 the company had on its maps 351 unsold lots, and anyone buying land would have to join the Club in order to enjoy the facilities of the lakes.

The Club's bylaws, passed in 1941, provide voting power as follows: "The voting power in The Moosic Lakes Club shall be determined by the ownership of lots as laid out on the maps of Moosic Lakes and shall be divided between the purchaser members in good standing and the members known as the developers or owners of the unsold land, in the following manner: Each purchaser member in good standing shall be entitled to one vote and the members known as the developers or owners shall be entitled to one vote for each lot owned and unsold as time to time laid out on the maps of Moosic Lakes, and which may also be

laid out on the maps of any after acquired land, which maps shall be filed in the office of the said members known as the developers and owners."

"Purchaser members" refers to Club members. "Developers or owners" refers to owners of unsold lots in the development, who were not required to be members of the Club; generally these were company members.

Since at the time of hearing in 1959 there were 115 members of the Club and 351 unsold lots, each with a vote, it is plain that the company owners of the lots dominated the enterprise. Since it had been their property in the first place and the Club a promotion device, there was nothing sinister in such domination. Had the sale of lots been brisk, the company's influence in the development would have decreased with time, and the Club's increased until the company's interest vanished, and doubtless this was the original plan.

Article Nine of the bylaws set up the Board of Directors in the following fashion: "The Board of Directors of The Moosic Lakes Club shall consist of three (3) persons one of whom shall be elected by the purchaser members of The Moosic Lakes Club and two of whom shall be appointed by the members known as the owners or developers so long as any lot or lots remain unsold as set forth in Article Eight Section 1 of these By-Laws, and who shall hold office for one year or until their successors are elected and appointed."

Under this provision it became the practice that the single Board member elected by the purchaser members chose the Club officers.

Dissatisfaction arose within the Club that its affairs should be governed by the owners of the unsold lots, only 100 acres of the 3000 in the development

having been sold. Since the bylaws provide, contra the practice of naming officers above referred to, that immediately after the annual meeting the Board of Directors shall elect officers from among its members, a meeting held on May 1, 1958, elected three McLaughlins to the posts of President, Vice-President, and Secretary & Treasurer.

On the same day defendants, members of the Club, sent out notices to the Club membership calling for a meeting on June 1st to change the bylaws by revoking the existing ones and adopting a new set. On this point the bylaws in Article XIX, provide: "Amendments to these By-Laws may be made at the annual meeting or at any meeting called for that purpose, by a majority vote, provided first, that written notice of the proposed amendments shall be submitted to the Board of Directors at a regular or special meeting and the proposed amendments are approved by a majority vote of Board of Directors and provided second, that notice of the proposed amendments, after approval be posted in a conspicuous place in the office at the Club at least ten (10) days before the date of the meeting at which the same is to be submitted."

It is admitted that the procedure for calling a special meeting outlined in Article XIX was not followed.

At the meeting the company presented its proxy to vote its 351 lots, but neither proxy nor votes were recognized or allowed. The meeting then altered the bylaws by removing the exemption of the company members from the requirement of Club membership, limiting voting rights to Club members, requiring directors to be Club members, and increasing the number of Club members on the Board of Directors from one out of three to two out of three. The meeting then elected new officers from among the defendants.

The Club then filed its complaint in equity, asking an injunction and the return of books and records. This relief was given and defendants have appealed.

The interesting history of the development, though not germane to the case before us, can be found in *Burke Appeal,* 378 Pa. 616 (1954), 108 A. 2d 58.

Appellants argue that the action taken at the meeting of June 1, 1958, was a repeal of the bylaws, not an amendment, and that since the bylaws did not give power to repeal them, the matter is covered by the Act of May 5, 1933, P. L. 289, Art. IV, §401, as amended, 15 PS §2851-401. This Section reads as follows: "The members of a nonprofit corporation shall have the power to make, alter, amend and repeal the by-laws of a nonprofit corporation, but the authority to make, alter, amend and repeal such by-laws may be expressly vested by the articles or by-laws in the board of directors, subject always to the power of the members to change such action. *Unless the articles or by-laws otherwise provide,* the powers hereby conferred shall be exercised by a majority vote of the members of the board of directors or of the members of the corporation who are present in person or by proxy and entitled to vote thereon, as the case may be, at any regular or special meeting duly convened after notice to the members or directors for that purpose." (Our emphasis)

In *Bagley v. Reno Oil Co.,* 201 Pa. 78 (1902), 50 A. 760, we said: "If one or more stockholders contemplate action of an unusual or extraordinary character, it is but reasonable that their associates should have notice that radical, and, what may prove disastrous changes, are contemplated, and that an effort will be made to effect them. If such changes are made with the approval of a majority of the stockholders upon notice to all, they affect and bind all; but they

should not be made until all have had an opportunity to be heard by receiving notice of what changes will be attempted, unless provision be made for them in the by-laws: Cook on Stock and Stockholders and Corporation Law (2d ed.), sec. 595. No more radical change can be made in the management of the affairs of a corporation than an increase in the number of its directors as fixed by its by-laws. Such increase may result in taking the control of a prosperous business from the hands of those who have successfully conducted it, and committing it to those who, with different notions, may lead it into ruin and disaster; honest management may be followed by a dishonest one; prodigality may take the place of frugality; a sense of security may be succeeded by unrest; and where all was right, everything may be wrong. Such changes, with such possible results to stockholders, ought not to take place before notice given of what the majority may do, and to which the minority must bow, if unable to avert the changes, after having had an opportunity to be heard and to act."

In our case nothing could be more radical than to uproot the company's control and substitute that of the Club. "Provisions affecting property or contractual rights cannot be repealed or altered without the consent of the parties whose interests are thereby impaired": *Schaad v. Hotel Easton Co.*, 369 Pa. 486, 492 (1952), 87 A. 2d 227; *Bechtold v. Coleman Realty Co.*, 367 Pa. 208 (1951), 79 A. 2d 661; *Stewart v. Monongahela Valley Country Club*, 177 Pa. Superior Ct. 632 (1955), 112 A. 2d 444.

Nor are we impressed by the argument that the by-law changes were not amendments but a repeal. Comparison shows far more sections left unchanged than changed, and the changes concentrate upon transferring corporate control from the company to the Club.

The whole scheme was a rather bald device to throw out the company and to wreck its influence in the Club.

For the same reason we put aside the contention that the election of new officers should be challenged only by an action in quo warranto. That might be true, under cases with facts like those in *Cella v. Davidson,* 304 Pa. 389 (1931), 156 A. 99, but *Siranovich v. Butkovich,* 359 Pa. 134 (1948), 58 A. 2d 461, suggests differently when the election of officers is purely incidental to the main stream of the case. That is so here, the election being only one factor in breaking the company's control over the Club. See also *Milasinovich v. Serbian Progressive Club,* 369 Pa. 26 (1951), 84 A. 2d 571.

It is as plain as a pikestaff that the meeting of June 1st was illegally called and illegally held, and hence that the new bylaws, whether called amendments or substitutions after repeal, are void.

Appellants' other arguments are makeweight and of no moment.

The decree is affirmed, costs on appellants.

Mr. Justice EAGEN took no part in the consideration or decision of this case.