McCaffrey et al., Appellants, *v.* Pittsburgh Athletic Association.

Argued January 13, 1972. Before Jones, C. J., Eagen, Roberts, Nix and Manderino, JJ.

*Gilbert E. Morcroft,* for appellants.

*Richard G. Kotarba,* with him *Howard I. Scott,* and *Meyer, Unkovic & Scott,* for appellee.

Opinion by Mr. Justice Eagen, June 28, 1972:

This appeal arises from a decree of the Court of Common Pleas of Allegheny County which denied equitable relief to appellants, all members of the Pittsburgh Athletic Association.

The gravamen of their complaint was that a certain bylaw purportedly passed at a meeting held November 14, 1967, which limited the transferability of certain membership certificates unlawfully deprived them of vested property rights.[1] Secondarily it was contended

---

[1] None of the appellants voted for or in any way consented to this amendment. Nor are any of them original life members but have instead come by their memberships in various other ways; as gifts or inheritances, purchases from original life members, through

that even if the questioned bylaw were found to be a proper exercise of corporate power, passage still had to be declared a nullity since the enactment did not receive the required two-thirds vote mandated in the bylaws.

After preliminary objections to this complaint were dismissed, the matter came on for trial before SILVESTRI, J., sitting as chancellor. At the completion of testimony the chancellor entered his adjudication and decree nisi dismissing the complaint. Exceptions were subsequently dismissed and a final decree was entered by the court en banc. This appeal was then filed.

Trial of the issue disclosed the following facts:

The Pittsburgh Athletic Association, a nonprofit membership corporation, was incorporated by decree of the Court of Common Pleas of Allegheny County on December 24, 1908, at No. 120 First Term, 1909. The Association's underlying purpose was and is the maintenance of a club for athletic exercises and social enjoyment.

Life membership was established under the original bylaws of the organization in 1908. Between the year of its establishment and 1923, some 164 original life memberships were sold by the Association, 122 of which are presently outstanding. Such membership called for an entrance fee of one thousand dollars.

The legend on the life membership certificate reads in pertinent part as follows:

"LIFE MEMBER"

"The membership hereby represented is *perpetually* exempt from dues and assessments but is subject to all other bylaws and rules.

--------

the Association itself acting as intermediary or from the estate of deceased members. Each of the transfers to them was in accordance with club procedure, pursuant to the bylaws, i.e., payment of a

"This membership is transferable on the books of the Association upon assignment and surrender of this Certificate in accordance with the provisions of the bylaws." [Emphasis supplied.] On the reverse of the certificate is a provision for its assignment and transfer "according to provisions set forth in the bylaws of said Association."[2]

During the intervening years between the foundation of the group and the inception of this lawsuit, the provisions in the bylaws dealing with life membership have been amended on several occasions.

Prior to February 6, 1922, the relevant portion of the bylaws provided that:

Section 4. "Life membership shall be transferable on the approval of the Board of Directors, subject to the regular action of the Membership Committee, upon the payment of a transfer fee equal to the amount of the resident initiation fee in force at the time transfer is made, and such members shall be exempt from the payment of dues and assessments. The Association has first opportunity to purchase any life membership which may be offered for sale."

Section 9. "Each Life Member shall pay an entrance fee of $1,000 and shall be exempt from the payment of annual dues."[3]

---

transfer fee, approval of the membership committee and the Board of Directors and transfer on the books of the Association.

[2] The bylaws of the Association from 1922 to 1967 provided that life membership was to be transferable by approval of the Board of Directors, subject to the regular action of the membership committee and upon payment of a transfer fee. The bylaws, however, were not explicit as to the period of this transferability, i.e., whether it was to continue as long as the membership was outstanding, or whether it was to be only for the life of the original holder. The parties presented conflicting testimony and interpretations at trial.

[3] At the February 6, 1922, meeting Section 9 was incorporated into the body of Section 4 by the membership.

In 1948 the word "Perpetual" was added to the title of Life Membership, so that it read in the bylaws "Life [Perpetual] Membership." In 1954 the bylaws were again amended by making the life membership transferable only to resident members. Finally, the amendment of November 14, 1967, which gave rise to the present dispute provided as follows:

Section 5. "Life Membership shall be transferable to a Resident member only on the approval of the Board of Directors, subject to the regular action of the Membership Committee, upon the payment of a transfer fee equal in amount to the Resident initiation fee in force at the time transfer is made, provided there be credited on such payment in the amount of any initiation fee already paid by him, and such member shall be exempt from the payment of dues and assessments.

"Effective ten (10) days following the enactment of this amendment Bylaw, all Life Memberships in existence will be entitled to one (1) transfer as set forth above, and if and when said transfer takes effect, the new certificate will be marked with the legend, 'This certificate is non-transferable'. However, the Life Member holding the new certificate will have all the other privileges of Life Membership as set forth herein, with

It should be noted that no bylaws were produced by either side for the period prior to 1922. The club's examination of its records turned up a portion of the 1922 bylaws and the first complete set of bylaws attached to the minutes of the 1939 annual membership meeting.

In order to determine what the *original* bylaw on life membership provided, the Association manager, a Mr. Bailey Settle, took the pre-February 6, 1922, provision and traced it back through the minute books of the Association to 1911 and discovered that it had never before been the subject of an amendment.

The same process was repeated with regard to the critical bylaw on the power to amend bylaws. The search revealed that the Association had this power from its inception, a fact which was conceded by appellants in their brief.

the exception of transfer rights and any rights incidental thereto.

"No Life Memberships, in addition to the 157 outstanding shall be issued. The Association has first opportunity to purchase any Life Membership which may be offered for sale."

Appellants assert that the effect of the 1967 amendment was to convert what had been a life membership, exempt from dues and assessments and heretofore continuously transferable, subject to the bylaw regulations, to a life membership which would be terminated at the death, resignation or expulsion of the transferee of the present holder. The inherent defect, in their estimation, is the deprivation of contractual and property rights; rights which were vested in the holders of life memberships and which cannot be divested without their consent. The property right so vested is declared to be the unqualified right to transfer each such certificate *in perpetuity*, exempt from dues and assessments in the hands of the holder.

It is appellee's position that while in past practice life memberships have been transferred beyond the life of the original life member, such transfers have always been made pursuant to the bylaws of the Association and their subsequent amendments. It is argued that the transferability of a life membership arose out of and exists solely by virtue of the bylaws of the Association and that an amendment limiting transferability is within the power of the Association, despite the fact that it may restrict privileges which were previously permitted by the liberal policy.

The chancellor concluded that it was necessary to strain the definition of life membership in order to find a perpetual right of transferability and declined to do so. He further found by analysis of the contract between the Association and its members that any right

of transferability emanated from the bylaws and as such, was subject to future amendment. On this basis he found that the Association was acting within the parameters of its authority in amending this bylaw and accordingly dismissed the complaint.

Two issues are presented for our determination: first, whether the court below erred in determining that life membership holders did not have a perpetual right to transfer such memberships; and second, whether it is now open to appellants to argue that the amendment did not receive the necessary vote of the membership.

We take as our starting point scrutiny of the term *life member*, in general and in the context in which it appears in the membership certificate document. While there is a dearth of cases on the point the term "life membership" was discussed by the court in *Masonic Country Club of Western Michigan v. Holden*, 12 F. 2d 951 (1926). At issue was the tax consequence of club membership. Analyzing the nature of such a membership, the court said at page 955: "It is a matter of common knowledge, of which this court will take judicial notice, that the kind of membership in clubs and organizations such as the plaintiff which is called life membership is a familiar one, and constitutes essentially, as its name indicates, membership for life, subject to earlier termination only by resignation or dishonorable expulsion." See also, *Martin v. Town & Country Development, Inc.*, 230 Cal. App. 2d 422, 41 Cal. Rptr. 47, 10 A.L.R. 3d 1347 (1964), wherein the holding of the trial court that lifetime membership meant for the lifetime of the plaintiffs was affirmed.

Instantly appellants direct our attention to the use of the word "perpetual" in the legend on the life membership certificate and in the bylaws. As was earlier noted, the certificate plainly states that, "The member-

158

ship hereby represented is perpetually exempt from dues and assessments, but is subject to all other by-laws and rules." However, the word "perpetual" appears but once on the certificate and then as a modifer of the phrase "dues and assessments". At no point does it modify the term "life member" nor in logic can it be transposed to do so. Moreover, if the word "perpetual" were given the meaning for which appellants contend, i.e., an indefinite existence or duration on the part of the membership and a right of perpetual transferability, the title "Life Member" would be bereft of meaning. Nor do we overlook the fact that the second paragraph of the certificate deals with the very matter of transferability and yet fails to use the word "perpetual".

We attribute little significance to the 1948 amendment to the title in the bylaws which formerly read "Life Members" and which now reads "Life [Perpetual] Members". We are instead persuaded by the reasoning of the lower court that, "At the most all that was intended was an attempted clarification and conformity to the legend on the Life Member Certificate that that membership was perpetually exempt from dues and assessments."

Appellants couple their argument that a vested property right in these memberships certificates arises by virtue of the contract between the Association and its individual members with the conclusion that this case is thus governed by such decisions as that of *Marshall v. Pilots Association*, 206 Pa. 182, 55 A. 916 (1903), and *Becker v. Berlin Beneficial Society*, 144 Pa. 232, 22 A. 699 (1891). Therein this Court refused to sanction what it deemed to be a forfeiture or impairment of pre-existing contract rights vested in the membership. The difficulty as we perceive it lies in the major premise of the aforementioned argument.

In our view the contract in the instant case consists of two elements: (1) the certificates of membership,

and (2), the bylaws (including subsequent amendments) of the corporation.[4] In lucid terms the certificate declares the holder to be perpetually exempt from all dues and assessments but "subject to all other bylaws and rules" and "transferable . . . in accordance with the provisions of the bylaws." Emanating as they do from the bylaws, the rights of the membership (including any right of transfer) are qualified from the outset. Any right granted could thus be revoked or changed. See *Moon v. Locomotive Engineers Ins. Ass'n.*, 343 Pa. 472, 23 A. 2d 474 (1942). While it would have been possible for the Association to fix forever all of the rights of life members, thus rendering them insusceptible to future alteration, the documents critical to this case indicate eschewal of such an approach since certificate rights (save in the areas of dues and assessments) are made totally dependent upon the bylaws. Appellants' reasoning, if accepted, would lead to an anomalous result in that their contract rights, if determined to be absolute and vested (with an unbridled right of transfer) would be different from and greater than their source, the bylaws.

In our judgment cases like *Moosic Lakes Club v. Gorski*, 402 Pa. 640, 168 A. 2d 343 (1961), cited by appellants, are inapposite since none deals with an "open contract" clause as is present instantly. In none of the cases cited were rights expressly taken and accepted subject to all bylaws of the organization. Furthermore, we are not convinced that the principles operating in the case of *Schaad v. Hotel Easton Co.*, 369 Pa. 486, 87

---

[4] See and Cf. *Kensington National Bank et al., Trustees v. Cedarbrook Country Club et al.*, 161 Pa. Superior Ct. 407, 54 A. 2d 838 (1947), where it was said by the court that the rights of holders of certain proprietary certificates depended upon the contract which they entered into with the Club when the certificates were issued, the terms of which were contained in the certificates and in the bylaws.

A. 2d 227 (1952), are in all ways relevant to the instant case. *Schaad* involved the attempted impairment through bylaw amendment of the rights of a preferred stockholder. Our Court held that certain contractual rights between a corporation and its members cannot be destroyed by a simple amendment to the bylaws without the consent of all those concerned even where there is provision for amendment. The Pittsburgh Athletic Association is, however, a nonprofit, *nonstock* corporation. The entirety of its assets is vested in the corporation alone; members are not and cannot be deemed *owners* in any sense of the term. What is being claimed presently is a vested right in the membership itself. Such a concept is rather ill-suited to consensual societies and clubs.[5] We adopt the pertinent observation of the chancellor that: "Inherent in the idea of a social club is the notion that those who make up the association be free to choose [possibly subject to certain limitations not here pertinent] who should belong and upon what terms. It is true that the right to choose its members may be given up by such a club. However, we find that this was not the intention here and we will not do it by indirection."

Appellants urge us, in the event of our deciding the first question adversely to them to remand this case to the lower court for a further hearing at which time argument will be received on whether the bylaw re-

---

[5] Concepts of voluntariness are inherent in the notion of a club or association. In *Carpenter v. Zoning Board of Appeals of Framingham*, 352 Mass. 54, 223 N.E. 2d 679, 681 (1967), the Supreme Judicial Court of Massachusetts said that a "club" could be said to be "an association or a corporation comprised of individuals joining together for social intercourse or some other common object," and noted also that "Samuel Johnson long ago defined a club as 'an assembly of good fellows, meeting under certain conditions.'" See also, Chafee, The Internal Affairs of Associations Not for Profit, 43 Harv. L. Rev. 993, 1006, 1007 (1930).

ceived the necessary vote. It is strongly asserted that the chancellor's resolution of the issue in his opinion, declaring it moot by agreement of the parties was clear error and an obvious abuse of discretion.[6]

The following additional facts help to illustrate the problem at hand. In their original complaint appellants asserted the amendment did not receive the necessary vote. Prior to the commencement of trial there was some on-the-record discussion about stipulating the number of votes cast. Appellants were willing to stipulate that 278 members attended the meeting and that the teller's count showed 179 votes for the resolution and 83 against. Appellee would not stipulate as to the *accuracy* of the teller's count. Disagreement centered around some 12 votes plus the question of how many members were still in attendance at the time of the vote. At this point the on-the-record stipulation discussion bogged down and ended inconclusively. The crucial fact of which we must take cognizance is that

---

[6] In his adjudication Judge SILVESTRI wrote: "At the trial of the matter the parties agreed, if it was found by the Court that the plaintiffs do not have a 'vested property right' in their membership and the defendant has the right to enact bylaws regulating the transfer of the 'Life Member' or if the plaintiffs do have a 'vested property right' in their membership, that in either event the question of the improper tabulation of the ballots cast would be moot, for the reason that under the first possible finding the defendant would be able to hold another meeting and rectify any alleged errors and under the second possible finding the bylaws amendment whether properly or improperly enacted would be a nullity."

The court en banc also found that the parties agreed to resolve the vote issue in the manner outlined by the chancellor, noting, however, that "The agreement . . . was not reduced to writing by counsel or placed in the record." It went on to say, "It is the opinion of this court that the better practice would have been to put the agreement of counsel in writing in the form of a stipulation and place it on the record. . . . This Court, however, will not vacate the decision of the Chancellor merely because of the conflicting recollection of one counsel."

at trial, counsel for appellants introduced no evidence whatsoever on the issue of whether or not the amendment carried.

While such failure seems to lend credence to the court en banc's conclusion that there was such a stipulation, we do not pass on the point since it is black letter law that an appellate court cannot consider anything which is not a part of the record in the case. See *Kilian v. Allegheny County Distributors, Inc.,* 409 Pa. 344, 185 A. 2d 517 (1962). However, we cannot overlook the barren state of the record on this issue conjoined with the fact that there was no reservation of the question on the record, and hence we conclude that the point was inadvertently or otherwise surrendered.

Decree affirmed. Each side to pay own costs.

Mr. Justice MANDERINO dissents.

Mr. Justice O'BRIEN and Mr. Justice POMEROY took no part in the consideration or decision of this case.