473 So.2d 1327 (1985)
Mrs. John M. REYNOLDS, a/K/a Marion Riddle Reynolds; Mrs. Nelson Swift Morris; and Peter Buswell and Sun Bank of Miami, As Executors of the Last Will & Testament of Mary R. Buswell; and Mrs. Zoe B. Armstrong Larimer; and Mr. Charles M. Raymond; and Mrs. Robert Pentland, Jr., and Maria A. Peterson, a/K/a Mrs. Robert Peterson; and Helen B. Alcock, a/K/a Mrs. Charles Alcock, et al., Appellants,
v.
THE SURF CLUB, a Florida Corporation Not for Profit, Appellee.
Nos. 83-2881, 83-2890, 83-2895, 83-2905 and 83-2913.
District Court of Appeal of Florida, Third District.
July 2, 1985.
Rehearing Denied September 6, 1985.
*1328 Sibley, Giblin, Levenson & Glaser, Miami Beach, for appellants.
Mershon, Sawyer, Johnston, Dunwody & Cole and Charles C. Kline, Miami, for appellee.
Before SCHWARTZ, C.J., and BASKIN and FERGUSON, JJ.
SCHWARTZ, Chief Judge.
These are appeals by parties aggrieved by the following final judgment:
"The above styled causes involve disputes between The Surf Club, a social club organized as a Florida corporation not for profit, and a group of the Club's members who hold Surf Club proprietor's certificates. The cases were consolidated for evidentiary proceedings. Case No. 74-18811 came before the Court on The Surf Club's Motion to Dissolve an Injunction which was entered by this Court in March of 1975. Case No. 80-21183 was tried before the Court on the issues raised by the claims and counterclaims for declaratory and injunctive relief. After reviewing the files, receiving the testimony of witnesses, examining the many exhibits introduced into evidence, considering all of the briefs and memorandums filed by the parties, hearing final argument of counsel and being otherwise fully advised in the premises, the Court renders the following decisions:

*1329 "AS TO CASE NO. 74-18811
"In 1975, The Surf Club was enjoined from borrowing money to finance its operations. Borrowing money to meet operating expenses was reducing the net worth of the Club in which proprietor members had an equitable interest. The Court further found that the Club's accumulated debt exceeded the $750,000.00 limitation contained in the Club's Charter. An attempt made in March of 1970 to amend the Charter and raise the debt limitation to $5,000,000.00 was found to be invalid because the amendment was not approved by a vote of a majority of the proprietors as required by the By-Laws and was not approved by the Secretary of State, as was required by statute. Jurisdiction was retained to determine what further relief, if any, might be necessary because the accumulated debt exceeded the $750,000.00 Charter limitation.
"The Surf Club now claims that the facts and circumstances leading to the injunction have substantially changed and the Club is no longer borrowing to finance its operation. Additionally, the Club claims that its debt no longer exceeds the Charter limitation because the same has now been properly amended.
"As to the Motion to Dissolve the Injunction in case # 74-18811, the Court makes the following findings of fact and conclusions of law:

"FINDINGS OF FACT
"1. The Surf Club is no longer borrowing to finance its operation.
"2. Since the entry of the injunction, new management of The Surf Club has taken substantial steps to assure that the Club will operate profitably. The membership has been increased 60%. Dues have been increased 140%, beverage and meal revenues have been increased substantially and special assessments totalling $195,975.00 have been levied.
"3. During each of the Club's last three fiscal years, it posted profits from its operations which profits totalled $848,054.00.
"4. The Surf Club has reduced its accumulated debt, which was $1,316,500.00 at the time of the injunction, to $1,028,067.00.
"5. A majority of the proprietor members of The Surf Club, at a special meeting of the proprietors duly called for that purpose, have voted to amend the Charter to raise the debt limitation to $5,000,000.00.
"6. The Charter amendment was approved by the Secretary of State.

"CONCLUSIONS OF LAW
"1. The Surf Club's accumulated debt no longer exceeds the limitations contained in its Charter, the same having been validly amended to raise the debt limitation to $5,000,000.00.
"2. The facts and circumstances have so changed that the injunction heretofore entered in Case No. 74-18811 is no longer necessary and it is just and equitable that the same be dissolved. See Shatterproof Glass Corp. v. Buckmaster, 256 So.2d 531 (Fla. 2d DCA 1972). See also Fla.R.Civ.P. 1.610(b)(3) and Seaboard Rendering Co. v. Conlon, 12 So.2d 882 (Fla. 1943); City of Hialeah v. Woods, 121 So.2d 41 (Fla. 3d DCA 1960).
"Based upon the findings and conclusions and all of the evidence presented, the motion of The Surf Club to dissolve the injunction in Case No. 74-18811 shall be and the same is hereby granted; the injunction heretofore issued in Case No. 74-18811 is dissolved effective with the entry of this Order.

"AS TO CASE NO. 80-21183
"This action was filed by The Surf Club against all holders of outstanding Surf Club Proprietor's Certificates. Process was served on all 227 holders of proprietor's certificates and notice by publication was given to all persons claiming any interest in the real and personal property of The Surf Club.
"The suit was prompted by a resolution adopted by the proprietor members of The Surf Club on April 14, 1979. Paragraph A of the resolution authorized the Board of *1330 Governors to lease a portion of the Club's property to a developer who would construct condominiums thereon for sale to Club members. The rent from the ground lease would be used to pay off the Club's accumulated debt and to defer other Club expenses including the expenses of operation.
"Paragraph D of the same resolution directed the Board of Governors to expel those members who refuse to pay dues and to sell their proprietor certificates in satisfaction of their indebtedness to the Club in accordance with the Club's By-Laws.
"This action was filed by The Surf Club to obtain a declaratory judgment that it may proceed with the condominium project and take all other action described in the resolution of April 14, 1979. Of the 227 holders of proprietor's certificates, 144 have answered consenting to the relief requested by the Club and defaults have been entered against an additional 35 certificate holders. The remaining 48 defendants answered alleging that the Club could not proceed with the condominium project without their consent, and could not expel them and sell their proprietary interest for nonpayment of dues. In addition, three defendants counterclaimed alleging that when their respective spouses died, they inherited their spouses certificates and exchanged those certificates for new Surf Club proprietor's certificates issued in their names. Since the new certificates were different in form than the old certificates, these Defendants claim fraud and seek an order rescinding the transactions and restoring them to their original certificates. Two other Defendants counterclaimed seeking to enjoin the Club from expelling them and selling their proprietary interests for nonpayment of dues. In summary, 79% of the proprietors have consented to the relief requested and 21% oppose the Club.
"At the outset, the Court is met with Defendants' argument that the issues raised by these pleadings have already been decided adversely to the Club in the case of Surf Club v. Long, 325 So.2d 66 (Fla. 3d DCA 1976). Defendants claim that the Long case established the certificate holders to be the owners of the legal title to the Club's property. Thus, they argue that all 227 certificate holders must join in any conveyance of the property or franchises of the Club. Defendants' argument is predicated upon the following language from the Long decision:
`On the authority of Surf Club v. Motland, Fla. 1957, 93 So.2d 384 at 386, we find the language appearing on the proprietors' certificates created a contractual relationship between The Surf Club and the holders thereof, and thereby the proprietors were vested with complete ownership of all property and franchises of the Club.' Surf Club v. Long, 325 So.2d 66, 69 (Fla. 3d DCA 1976) (emphasis added).
"Defendants' reliance upon the Long case is misplaced. That case did not involve the question of who owns the legal title to the Club's property or who could authorize the lease of that property. Instead, the Long case was an action to enjoin mismanagement and waste. When the Long case was decided, the then Board of Governors was mismanaging the Club by borrowing large sums to finance operations, thereby wasting the assets of the Club in which all proprietor members had an equitable interest. Also the then Board of Governors had tried to amend the By-Laws to redefine the nature of a proprietor's interest and to amend the Charter to authorize the increased debt. The Long case held that these amendments to the By-Laws and Charter were not properly passed by the percentage of proprietor votes required by the 1935 By-Laws and thus the amendments violated the contractual arrangement established by the Charter and By-Laws. In addition, the Charter amendment was not approved by the Secretary of State as was required by statute.
"The statement in the opinion in the Long case that the proprietor members were the owners of the property and franchises of the Club was merely an indication that the proprietary members had an equitable interest in the Club assets and thus had standing to challenge the Club's mismanagement and waste of those assets. *1331 This is consistent with the universally recognized rule that the title to the property of an incorporated club or association is vested in the corporation and not in its members. See, e.g., Kensington National Bank v. Cedarbrook Country Club, 161 Pa.Super. 407, 54 A.2d 838 (1947), wherein the Court expressed the rule as follows:
`[T]itle to the property is vested in the nonprofit corporation, the right of holders of certificates is not a property right, but depends upon the contract of the certificate and must be judged in accordance with its terms.' Kensington National Bank v. Cedarbrook Country Club, supra at 839. See also Graham v. Kirchner, 287 S.W.2d 830 (Mo. 1956).
"When the statement in the Long case that the proprietors are `vested with complete ownership of all of the property and franchises of the Club' is construed to mean equitable ownership, the opinion becomes perfectly consistent with the well recognized principle that as between a corporation and its stockholders or members, the equitable ownership of the corporation's property is in the stockholders or members. See, e.g. Berl v. Crutcher, 60 F.2d 440 (5th Cir.1932). See generally 18 C.J.S. Corporations § 512.
"Reading the Long case in light of the issues actually before the Court reveals that the case did not involve the question of who owns legal title to the Club's property. Likewise no issue was presented in the Long case as to the rights of members who are delinquent in their dues or the right of the Club to properly amend its Charter and By-Laws, if in fact the amendments were passed by a proper vote of the proprietors as required by the By-Laws. Since the Court in the Long case was not called upon to decide these issues, any language in the opinion relating to these issues would be unnecessary to the decision and obiter dictum. The actual holding in the Long case did not determine who owns legal title to the Club's property, the rights of non-dues paying proprietors or the propriety of amendments to the Charter and By-Laws actually passed by the required vote of the proprietors. Thus Long is no bar to the Court's determination of these issues.
"Some of the Defendants have raised another threshold issue which the Court must decide. They claim that the question of whether the Club can expel them for nonpayment of dues and sell their proprietary interests was not properly presented by the pleadings. The Court finds that the issues were properly presented for several reasons. First, the Club alleged in its Complaint that some certificate holders were delinquent in their dues and asked for a declaration that it could take all the action contemplated in the April 14, 1979, resolution. Paragraph D of that resolution, which was attached to the Complaint, called for the Board of Governors to proceed with the expulsion and sale of the interests of delinquent proprietors. Second, many of the Defendants answered by alleging that the threatened expulsion and sale of proprietor interests was unlawful. Third, two of the Defendants counterclaimed seeking to enjoin the Club from expelling them and from selling their proprietorships. Finally, in order for the Court to determine whether the lease of the property required the approval of delinquent proprietors, the Court must consider the full nature of the rights of delinquent proprietors. Since the right to lease Club property and the right of the Club to expel and sell the interests of delinquent proprietors have not been previously determined and are properly presented by the pleadings, the Court must and does hereby find the facts and declare the legal rights of the parties as to these issues.

"FINDINGS OF FACT
"1. The first series of proprietor's certificates were created and defined by the By-Laws of The Surf Club, as amended, January 26, 1935 [hereinafter 1935 By-Laws].
"2. Under the 1935 By-Laws, proprietors were defined as regular members of The Surf Club who upon dissolution were entitled to their pro rata share of the property and franchises of the Club or the proceeds of sale thereof. Regular members, on the other hand, were described as *1332 having no interest in the property or franchises of the Club. (Emphasis supplied by the Court.)
"3. In the event of the death of a proprietor or the transfer of his interest, the 1935 By-Laws provided that proprietorship terminated and the Club had the power to make the new holder of the certificate a member, or to repurchase the certificate for its pro rata share of the net asset value of the Club, as appraised by the Board of Governors. (Emphasis supplied by the Court.)
"4. There was no provision in the 1935 By-Laws allowing proprietors to resign their membership.
"5. The 1935 By-Laws provided that proprietors could be expelled by the Board of Governors for nonpayment of dues and their proprietary interest could be sold to satisfy their debt to the Club.
"6. The 1935 By-Laws provided that those provisions in the By-Laws pertaining to the rights of proprietors could be amended by a vote of two-thirds of the proprietors eligible to vote at any annual meeting, or any special meeting called for that purpose.
"7. The Club By-Laws have always provided that members delinquent in their dues were ineligible to vote.
"8. The By-Laws were amended at the annual meeting of January 28, 1939, to allow proprietors to resign. The meeting was called pursuant to notice and the amendment was approved by a vote of two-thirds of the proprietors entitled to vote. The 1939 resignation provision required proprietors to exchange their certificates for an "ownership unit" in order to resign. Ownership units were redeemable by the Club under the 1935 By-Laws at any time for $3,000.00. The full text of the 1939 resignation provision reads as follows:
`A proprietor may resign as a proprietor at any time by presenting his written resignation, together with his proprietorship certificate, provided all indebtedness to the Club of every nature whatsoever of such proprietor be fully paid at the time of such resignation. Thereafter, the interest of the proprietor so resigning, shall be the interest of a holder of an ownership unit and he shall have no other interest or right in the Club or its assets whatsoever, and the Club shall in return for his resignation and proprietorship certificate, issue such former proprietor a proper certificate evidencing his ownership of an ownership unit.' Article X Section 4 The Surf Club By-Laws, as amended January 28, 1939.
"9. The provision allowing proprietors to resign was amended in 1942. The 1942 resignation clause also required proprietors to turn in their certificates in order to resign. Under the 1942 provision, resigning proprietors could not vote but had the right to share pro rata with other proprietors in the net assets on dissolution. The text of the 1942 resignation provision reads as follows:
`A proprietor may resign as a proprietor at any time by presenting his written resignation, together with his proprietorship certificate, provided all indebtedness to the Club of every nature whatsoever of such proprietor be fully paid at the time of such resignation. Thereafter, the proprietor so resigning shall have no further interest or voting rights in the Club except upon dissolution he shall share in the assets, pro rata with other proprietors, after amounts due under ownership units have been paid.' Article X Section 4 The Surf Club By-Laws, as amended January 31, 1942.
"10. Over 200 holders of first series proprietor's certificates have turned in their proprietor's certificates in order to resign under the 1939 or 1942 By-Laws above quoted.
"11. Beginning in the 1960's, confusion arose as to whether proprietors must turn in their first series certificates in order to resign. A few members received letters from employees or officers of the Club stating that the members could resign and retain their certificates. These statements were never authorized by a vote of the proprietors and the By-Law regarding resignation was never repealed by a vote of two-thirds of the proprietors.
*1333 "12. In 1970 the By-Laws were amended prospectively, only, to create a new form of proprietor's certificate. The new series of certificate, which was issued after 1970, plainly provided on its face that in the event of the death or resignation of the proprietor, or upon the transfer of the certificate, the same could be redeemed by the Club for $1,000.00. The 1970 amendment provided that it was not intended to effect the rights of first series proprietors.
"13. Those Defendants who inherited first series certificates from their ancestors and exchanged those certificates for the new form of certificates did so under circumstances such that they knew or with reasonable diligence should have known of the different provisions regarding the redemption of the certificates. The Surf Club did not expressly or impliedly represent that the new certificates would contain the same provisions as the former certificates. The new certificates were voluntarily accepted by the proprietors and they paid dues and enjoyed the benefits of proprietor membership for several years and in some cases many years without complaining about the terms of the new certificates.
"14. In 1979 the Board of Governors determined that it would be in the best interest of the Club to provide condominium apartments on the premises for its members. The Club has a history of building and providing rental apartments for its members ever since the Club was opened in 1930 and has received a significant portion of its general revenues from the rentals of these apartments. In 1974 some of these rental apartments were co-oped and sold to members of the Club.
"15. The forty-eight Defendants who contest the Club's right to proceed with the condominium project are, for the most part, proprietors who hold first series certificates, but who refuse to pay dues or turn in their proprietor's certificates in order to comply with the 1939 or 1942 By-Laws regarding resignation.
"16. These circumstances prompted the Board of Governors to call a special meeting of the proprietors on April 14, 1979. Notice of the meeting was given to all proprietors current in the payment of their dues. The proprietors voted to authorize the Board of Governors to lease a portion of the Club's property to a developer for ninety-nine years for the purpose of building condominiums thereon for sale to members. The vote was 98 for, 1 opposed and 1 abstention. The proprietors also voted to direct the Board of Governors to proceed to expel and sell the interests of those proprietors who refused to pay dues and refused to turn in their certificates as required by the 1939 and 1942 By-Laws. The vote was unanimous.
"17. Thereafter, the Board of Governors gave written notice to all proprietors not current in the payment of their dues. The notice advised the proprietors of the By-Laws requiring them to turn in their certificates in order to resign. The notice also advised the proprietors of the amount of dues which had accumulated against their certificates. The members were told that unpaid dues would be forgiven if they would properly resign by turning in their certificates. Since some of the certificates had been issued prior to 1942 and some after, the proprietors were given the option of receiving an `ownership unit' as called for by the 1939 resignation By-Law, or an `inactive certificate' which sets forth the rights of a proprietor resigning under the 1942 amendment. The proprietors were advised that if they did not exchange their certificates, they would be expelled and their proprietary interests sold in accordance with the By-Laws of 1935.
"18. Title to the real property which is the subject of this action was transferred from The Surf Hotel Corporation to The Surf Club by general warranty deed in 1935. The property is described as follows:
`Lots A and Lots 1 through 9, less right of way, block 1, Altos Del Mar No. 4, Plat Book 10, Page 63, Public Records of Dade County, Florida.
Tract B, Altos Del Mar No. 4, Amended Plat Book 34, Page 7, Dade County, Florida. *1334 Tract U, Altos Del Mar No. 4, Amended Plat Book 34, Page 7, Dade County, Florida.'
"19. Since 1935, the By-Laws of The Surf Club have provided that `[t]he business and affairs of the Club shall be managed by a Board of Governors.'
"20. There has never been a requirement in the Charter or By-Laws of The Surf Club that the sale or lease of Club property be approved by the proprietor members of the Club.[1]

"DISCUSSION OF THE ISSUES

"A. The Condominium Project.

"The foregoing facts appear without substantial controversy from the minutes and other corporate records of The Surf Club. Nothing in the evidence presented suggests that the certificate holders were ever intended to hold the legal title to the property of the Club, nor was there ever an instrument sufficient to convey such title. The legal principles applicable to the controversy regarding the condominium project are well expressed in the Kensington and Graham cases cited, supra.
"The plaintiffs contend that, as holders of proprietary certificates, their right is a vested one in the property of the club, and since the meeting pertains to the sale of the club's property, they are entitled to vote, although they are not members but only representatives of former members now deceased, or are former members who resigned. The fallacy behind this concept is that the title to the property is vested in the nonprofit corporation; the right of holders of certificates is not a property right, but depends upon the contract of the certificate and must be judged in accordance with its terms.' Kensington National Bank v. Cedarbrook Country Club, 161 Pa.Super. 407, 54 A.2d 838, 839 (1947) (emphasis added). `This is an incorporated club and title to the property is in the corporation and not in the membership. See 14 C.J.S. Clubs § 4, page 1280, 1281, where the rule is thus stated: "in case of the incorporation of a pre-existing club, the corporation generally succeeds to its property." A member of an incorporated club like the defendant in this case does not have any title to any of the property. In case a member resigns or for any other reason ceases to be a member, all rights of the member are terminated.' Graham v. Kirchner, 287 S.W.2d 830, 834 (Mo. 1956) (emphasis added).
"Absent some statutory provision, it is the governing body of an incorporated club or association that has the authority to deal with the real and personal property of the Club, subject always to the requirements of the corporation's Charter and By-Laws. See Harris v. East Lake Properties, Ltd., 225 Ga. 521, 170 S.E.2d 229 (1969), wherein the board of governors of an incorporated athletic club was found to have the authority to sell one of its golf courses without the approval of a majority of the proprietary members of the club. In the instant case, both the governing body of the Club and the dues paying proprietary members have voted overwhelmingly to approve the condominium project.

"B. The Rights of Non-Dues Paying Proprietors.

"As to the right of the non-dues paying proprietors to hold their certificates, that issue appears to be controlled by the By-Laws which are part of the contractual arrangement between the Club and all of its members. The By-Laws plainly require that certificate holders must turn in their certificates in order to resign, otherwise, dues will become delinquent, the proprietors will become ineligible to vote, and they can be expelled and their proprietary interest sold in accordance with the original By-Laws.
"No evidence was offered as to why the forty-eight Defendants who now oppose the Club should be excused from the *1335 resignation provisions which are a part of their contract and which were complied with by the previous 200 first series certificate holders who resigned. The Defendants argue that the resignation By-Laws are somehow invalid, but that argument is not persuasive. If there were no resignation provision, dues would continue to accumulate against the certificates. Furthermore, the By-Laws were amended to add the resignation provision in strict compliance with the requirements for amendments. Under the circumstances of this case, there is no reason why a social club, organized as a not for profit corporation, can not amend its By-Laws to provide the means and terms for resignation of proprietor membership, particularly when the original By-Laws neglected to deal with the subject and the amendment was duly proposed and adopted relatively soon after the adoption of the original By-Laws:
`It must be conceded that the defendant, like every other corporation, possessed the inherent power of self government. Its by-laws are the channels through which this power is exerted and declare the corporate will as to the manner in which the corporate functions are to be exercised and such other matters as to which it may properly and lawfully legislate. Of course the power to make such laws carries with it the power to alter and amend them in the manner prescribed. Voluntary acceptance of membership in such a corporation necessarily involves and implies the assent of each member to every amendment to the by-laws the substance of which is the proper subject of such law and which has been formerly and regularly adopted.' Hayes v. German Beneficial Union, 35 Pa.Super. 142, 147 (Pa. 1908).
"The language in the Kensington case, supra regarding the rights of non-dues paying proprietors is also instructive on this point.
`In considering the rights of the holders of the proprietary certificates we must keep in mind that the subscription was merely a contribution to the establishment of a non-profit corporation for the purpose of maintaining a golf club. The subscription was not an investment in a real estate project, to be sold when a favorable opportunity was present; nor was it a lien upon the real estate; nor a debt to be paid at a specific time. That which the holders received was a contract which, by its terms was specifically subject to the by-laws and to the changes in the by-laws that might be made from time to time. Thus the right granted could be revoked or changed. (citations omitted). These by-laws have been changed to meet the economic necessities of the times, and to perpetuate the golf club in accordance with the purpose expressed in the Charter.' Kensington National Bank v. Cedarbrook Country Club, 161 Pa.Super. 407, 54 A.2d 838, 839-40 (Sup.Ct. 1947) (emphasis added).
"Probably the closest case on point is the decision in McCaffrey v. Pittsburg Athletic Association, 448 Pa. 151, 293 A.2d 51 (Sup. Ct. 1972). In that case, several members of an athletic club challenged a by-law amendment which limited the transferability of their memberships. Prior to their amendment, the members could transfer their membership certificates without club approval. Indeed, the right to do so was plainly stated on their membership certificates. They argued that the change in the by-laws limiting the transferability violated their contractual rights. The Superior Court of Pennsylvania disagreed:
`In our view the contract in the instant case consists of two elements (1) the certificates of membership, and (2) the by-laws (including subsequent amendments) of the corporation. In lucid terms the certificate declares the holder to be perpetually exempt from all dues and assessments but "subject to all other by-laws and rules" and "transferable ... in accordance with the provisions of the by-laws." Emanating as they do from the by-laws, the rights of the membership (including any right of transfer) are qualified from the outset. Any right granted could thus be revoked or changed. See Moon v. Locomotive Engineers Insurance Association, 343 Pa. 472, 23 A.2d 474 (1942).' McCaffrey v. *1336 Pittsburg Athletic Association, 448 Pa. 151, 293 A.2d 51, 56 (Sup.Ct. 1972).
"Emanating as they do from the 1935 By-Laws, the rights of proprietors can not be any greater than the qualifier contained in those same By-Laws that they could be amended by vote of two-thirds of the proprietors present or voting by proxy at any annual meeting. This is particularly so where as here the 1939 amendment was needed to fill in an obvious oversight in the original By-Laws.
"From the evidence presented, it appears that the resignation provision applicable to first series certificate holders is valid. Because the resignation provision was changed in 1942 after many certificates had been issued, the club has given certificate holders the option of resigning under either the 1939 or 1942 provisions. No Defendant has objected to the fact that a choice was offered and under the circumstances it appears reasonable.
"Defendants have objected to the Club's interpretation of the rights of proprietors resigning under the 1942 amendment, however, the Court finds that the Club's Inactive Certificate (Trial Exhibit No. 65), fairly sets forth the rights of proprietors who resign their membership under the 1942 By-Law. Without the inactive membership status created by that certificate, the resigning proprietor would lack the "membership status" necessary to make any claim to the distribution of the assets of a non-stock corporation. See § 617.011(1), Florida Statutes (1982 Supp.) which limits the distribution of the net assets of a non-stock corporation to its members subject to court approval.
"Accordingly, the court declares the rights of the parties as follows:

"DECLARATIONS OF THE LAW
"1. The Court has jurisdiction over The Surf Club, all holders of The Surf Club proprietor's certificates, and all persons claiming any interest in the real and personal property of The Surf Club including that certain real property hereinafter described;
"2. The Surf Club is the owner and holder of the legal title in fee simple of the following described real property, subject to liens, assessments, covenants and other conditions, limitations and qualifications of record.
`Lots A and lots 1 through 9, less right of way, block 1, Altos Del Mar No. 4, Plat Book 10, Page 63, Public Records of Dade County, Florida.
Tract B, Altos Del Mar No. 4, amended Plat Book 34, Page 7, Dade County, Florida.
Tract U, Altos Del Mar No. 4, amended Plat Book 34, Page 7, Dade County, Florida.'
"3. The proprietor members of The Surf Club do not own the legal title to the real and personal property of The Surf Club. Upon dissolution of The Surf Club the holders of Proprietor's Certificates and Inactive Proprietor's Certificates are entitled to share pro rata in the distribution of the net assets of the Club, or the proceeds of sale thereof;
"4. The proposed lease of a portion of Surf Club real property and the construction of a condominium project thereon, the units of which will be sold to members of the Club in accordance with the Resolution of proprietor members of April 14, 1979, is a permissible use of Club property consistent with the object and purposes of the corporation;
"5. The Surf Club has the right to use the net lease revenues from the lease of its property as proposed in the resolution of April 14, 1979, for all Club purposes including the retirement of the Club's accumulated debt and the payment of the Club's ongoing expenses of operation;
"6. The Board of Governors of The Surf Club has the power and authority to sell, lease, mortgage or otherwise utilize or dispose of all or any part or interest of The Surf Club's real or personal property, free and clear of all claims by, through or under any and all proprietor's certificates, any holders of such certificates and all persons *1337 claiming by, through or under such persons;
"7. The holders of Surf Club first series proprietor's certificates who refuse to pay dues and who refuse to exchange their certificates for an `ownership unit' or an `inactive certificate' may be expelled for non-payment of dues and their interest may be sold to satisfy the amounts of their indebtedness to the Club;
"8. As to the counterclaims filed on behalf of the Estates of Eleazer W. Clark and Edwin B. Mead, to enjoin the Club from expelling the holders of their certificates and selling their proprietary interest for non-payment of dues, judgment is entered in favor of The Surf Club and against said Counterclaimants for the reasons aforesaid. The preliminary injunction heretofore entered restraining the Club from expelling and selling the interest of the holders of the decedents certificates is hereby dissolved;
"9. As to the counterclaim for fraud and rescission filed by the Estate of Alfred I. Barton, Mrs. Robert Pentland, Jr. and Mrs. Robert Peterson, the Court finds that the essential elements of a claim for fraud are absent. There were no misrepresentations, no intent that the Counterdefendants rely on any representations, and no reasonable reliance by Counterdefendants. See Amazon v. Davidson, 390 So.2d 383 (Fla. 5th DCA 1980). Furthermore, Counterdefendants may not rescind their exchange transactions, having ratified the same by accepting the benefits of the new certificates under circumstances such that they must have or should with reasonable diligence have discovered the difference in their new certificates. Ball v. Ball, 160 Fla. 601, 36 So.2d 172 (Fla. 1948). Accordingly, judgment is hereby entered in favor of The Surf Club and against the Estate of Alfred I. Barton, Mrs. Robert Pentland, Jr. and Mrs. Robert Peterson on their counterclaims for fraud; said Defendants to take nothing by their counterclaims and go hence without day... ."
The appellants' most significant contention is that the trial court's failure to enjoin the Club from leasing, selling, or mortgaging its property without their concurrence is contrary to the law of the case established by our prior opinion in Surf Club v. Long, 325 So.2d 66 (Fla. 3d DCA 1975), cert. denied, 339 So.2d 1173 (Fla. 1976). We cannot agree. The Long case involved only an appropriate exercise of equity's authority to enjoin the mismanagement of the Club's assets on behalf of the proprietor's certificate holders, who, as the trial court pointed out, occupy a position equivalent to that of corporate shareholders. See Orlando Orange Groves Co. v. Hale, 107 Fla. 304, 144 So. 674 (1932); Schwadel v. Uchitel, 455 So.2d 401 (Fla. 3d DCA 1984). But the threatened and actual improprieties precluded by Long do not now exist and are not now in issue. As shown in part by the fact that the Circuit Court judgment affirmed there specifically permitted an appropriate mortgage, the Long decision is therefore entirely consistent with the present result. 3 Fla.Jur.2d Appellate Review § 419 ("The [law of the case] doctrine ... does not apply where the facts involved on the second appeal are different from those involved on the first appeal, so that the principles announced on the first appeal do not apply."); § 421 ("the rule of the law of the case can be applied only to questions actually or impliedly presented to and decided by the reviewing court.") (1978).
Beyond this, we can add nothing to the learned trial judge's comprehensive opinion and decision which we adopt and entirely approve.
Affirmed.
NOTES
[1] "The By-Laws did require that any sale or lease of Club property be approved by two-thirds of the holders of outstanding `ownership units,' however, there are no outstanding ownership units since they were all redeemed by November 5, 1957."