IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cathy L. Albert,             :
            Petitioner       :
                             :   No.  1118 C.D. 2018
        v.                   :
                             :   Submitted:  January 4, 2019
Unemployment Compensation    :
Board of Review,             :
            Respondent       :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ELLEN CEISLER, Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                          FILED:  May 23, 2019


        Cathy L. Albert (Claimant), proceeding *pro se*, petitions for review of the
June 13, 2018 decision of the Unemployment Compensation Board of Review (Board),
affirming a referee's decision that found Claimant ineligible for unemployment
compensation (UC) benefits pursuant to section 402(e) of the Unemployment
Compensation Law (Law).[1]


                    **Facts and Procedural History**

        Claimant was employed as a toll collector with the Pennsylvania Turnpike
Commission (Employer) until December 13, 2017, when she was discharged for

---

[1] Section 402(e) of the Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(e).  Section 402(e) provides that "an employe shall be ineligible for compensation for any week . . . [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, irrespective of whether or not such work is 'employment' as defined in this act."  43 P.S. §802(e).

violating Employer's attendance policy.  Claimant applied for UC benefits, but the local service center found her ineligible.  Claimant appealed, and a referee conducted a hearing at which Claimant and Employer appeared and presented testimony.

Employer presented the testimony of three witnesses:  Pat Caro, Employer's Manager of Labor Relations, and Steve Miller and Darrell Coleman, both Interchange Managers for Employer.  Mr. Miller testified that Claimant was scheduled to work a 7:00 a.m. to 3:00 p.m. shift on December 11, 2017, and pursuant to Employer's policy, employees requesting leave are required to notify Employer at least two hours prior to the start of their shift.  Mr. Miller stated that Claimant called him at 7:44 p.m. on the evening of December 11, 2017, after her shift had ended, stating that she was having "family problems" and would not be in the following day.  (Certified Record (C.R.) at Item No. 8, Notes of Testimony (N.T.) at 1, 6-7.)

Employer next presented the testimony of Mr. Coleman, who testified that, prior to terminating an employee, it is Employer's procedure to conduct an interview with the employee in order to get the employee's perspective.  Mr. Coleman stated that he conducted a termination interview with Claimant after the December 11 incident in order to "get her side of the story."  (C.R. at Item No. 8, N.T. at 8.)  Mr. Coleman stated that Claimant did not say anything or present any evidence during the interview, and thus he proceeded with the termination.  *Id.*

Finally, Mr. Caro testified for Employer regarding Employer's three-step disciplinary policy.  For the first disciplinary infraction, Mr. Caro stated that an employee receives a warning letter, which remains in effect for six months—essentially putting the employee on probation for that time period.  If a second disciplinary infraction occurs within those six months, Mr. Caro testified that the employee receives a two-day suspension without pay, the probationary period restarts and remains in effect for a period of 12 months.  If a third disciplinary infraction occurs within that

12-month period, Mr. Caro testified that the employee is discharged. (C.R. at Item No. 8, N.T. 9-10; C.R. at Item No. 3.)

Employer submitted documentation showing that Claimant received a warning letter on July 6, 2017, for exceeding three procedural errors in a six-month period. The letter also provided the following warning: "Any violation that occurs within six (6) months from 07/06/17 will result in further discipline up to and including termination." (C.R. at Item No. 3, Exhibit 10.) Because Claimant committed another disciplinary infraction for "Reporting Late to Work Without Receiving Management Permission" during the six-month period after receiving the warning letter, Claimant received a two-day suspension without pay on October 11, 2017. (C.R. at Item No. 3, Exhibit 7). The October 11, 2017 suspension letter likewise warned Claimant that any violation that occurred within the next 12 months would result in "further discipline up to and including termination." *Id.* Finally, on December 15, 2017, Employer issued Claimant a termination letter, advising her that she had been terminated as of December 13, 2017, for violating the Toll Collection-Fares Bulletin No. 4.4, (C.R. at Item No. 3, Exhibit 6), regarding absent without leave status, because she failed to report to work or call on December 11, 2017, which was within 12 months of her two-day suspension. (C.R. at Item No. 3, Exhibit 11.)

During her testimony, Claimant acknowledged that she was terminated; she was aware of the policy about calling off two hours before a shift; that she had received a warning in July and a suspension in October; that the next disciplinary step for her would be termination; that she was scheduled to work on December 11, 2017; and that she did not report to work that day or contact a manager until after the shift ended. Claimant testified that she "was not able" to call a manager because she "was going through withdrawals from [her] medication." (C.R. at Item No. 8, N.T. at 10.) Claimant stated that she was in the process of weaning off one medication in order to

3

start another. (C.R. at Item No. 8, N.T. at 11.) Claimant indicated that, during the night before her shift, she was "up all night long" because she was sick but, after she did eventually fall asleep, she did not wake up until after her shift had ended on December 11, 2017. (C.R. at Item No. 8, N.T. at 15.) Claimant acknowledged that she did not immediately call Employer upon waking up, and instead called her doctor to explain what happened. (C.R. at Item No. 8, N.T. at 13.)

Claimant stated that she spoke with someone in human resources after December 11th in order to file for FMLA leave[2] "to protect [her]self from this . . . situation." (C.R. at Item No. 8, N.T. at 12.) When asked by the referee if Claimant had medical documentation or paperwork indicating the symptoms to be expected when withdrawing from the medication she was taking, she stated, "I don't. It's pretty common knowledge." (C.R. at Item No. 8, N.T. at 15.) However, Claimant submitted a copy of the FMLA paperwork her doctor filled out on December 12, 2017. Claimant admitted that she did not give her side of the story during the interview before her termination, explaining that she did not want to tell people about her medical history because, in her opinion, people would not understand her medical condition. (C.R. at Item No. 8, N.T. at 13.)

Claimant acknowledged she may have cited "family issues" as the reason for her failure to come into work when she spoke with her manager because she was "distraught" and "knew [she] was in big trouble." (C.R. at Item No. 8, at 17.) Claimant also admitted that she did not tell Employer about her health issues, apply for FMLA leave, or otherwise seek time off prior to December 11, 2017, despite the fact that the two-day suspension she received was also due to her health issues. Claimant stated, "I

---

[2] FMLA refers to the Federal Family and Medical Leave Act of 1993, 29 U.S.C. §§2601-2654.

4

had problems before and I didn't want to be that person who was going to go on SMA[3] again. I didn't want to do that. I wanted to strive to stick it out. . . . I wanted to just try to do the job at hand." (C.R. at Item No. 8, N.T. at 14.)

The referee issued a decision denying Claimant benefits and finding the following pertinent facts:

1. The [C]laimant was last employed as a full-time toll collector by [Employer] from March 9, 2012[,] until December 13, 2017 . . . .
2. The [E]mployer has an attendance policy which requires employees to call off at least two hours prior to a scheduled shift.
3. The attendance policy provides for progressive discipline including a written warning, a suspension and termination.
4. On July 6, 2017, the [C]laimant received a written warning for procedural errors.
5. On October 11, 2017, the [C]laimant received a suspension for being late to work.
6. The [C]laimant was diagnosed with [various medical conditions].
7. The [C]laimant was scheduled to work at 7:00 a.m. on December 11, 2017.
8. The [C]laimant did not report to work on December 11, 2017.
9. The [C]laimant did not contact her manager to report off until 7:45 p.m.
10. The [C]laimant told the manager that she was absent due to family issues.
11. On December 12, 2017, the [C]laimant had her treating provider fill out Family [and] Medical Leave Act (FMLA) paper work [sic].
12. The paperwork indicated that the [C]laimant would require intermittent leave up to twice a month for up to three days at a time.
13. The [E]mployer discharged the [C]laimant under its policy for failing to call off.

(Findings of Fact (F.F.) Nos. 1-13.)

---

[3] SMA is not defined in the record. Claimant stated that SMA was "when you're off for like disability you know, to take off." (C.R. at Item No. 8, at 12.)

In his opinion, the referee rejected Claimant's testimony that she was unable to contact Employer earlier than she did, observing that, if Claimant were as sick as she claimed, she could have alerted Employer the night before. The referee also observed that Claimant did not present any medical documentation showing that she was withdrawing from medication or explaining the potential side effects of doing so. The referee reasoned that, even if Claimant had not anticipated "passing out," Claimant nonetheless acknowledged that she did not contact her manager as soon as she had awoken. (Referee's op. at 2.) Thus, the referee determined that Claimant was ineligible for benefits under section 402(e) of the Law because she was discharged for actions that constituted willful misconduct. Claimant appealed to the Board, but the Board affirmed, adopting and incorporating the referee's findings and conclusions. (C.R. at Item No. 14.)

Claimant filed the present petition for review with this Court.[4] In Claimant's two-paragraph argument, she asserts that the referee erred in finding there was insufficient evidence to show that Claimant's medical and other problems required her absence at work. In the first paragraph of her argument, Claimant quotes what appears to be a portion of her collective bargaining agreement with Employer, emphasizing the portion that states employees may only receive paid sick time if they notify a supervisor within two hours of the start of their shift, "unless a proven emergency prevents the employee from calling within said two (2) hours."[5] (Claimant's brief at 9) (emphasis omitted). Claimant argues that "[p]roven medical

---

[4] Our scope of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, and whether findings of fact are supported by substantial evidence. *Torres-Bobe v. Unemployment Compensation Board of Review*, 125 A.3d 122, 126 n.3 (Pa. Cmwlth. 2015).

[5] Claimant refers to the document as the "Pennsylvania Turnpike Commission Teamsters Local Union NOS. 77 and 250 Field Agreement; Article 15 – Leave of Absence, Section 1." (Claimant's brief at 9.)

documentation was provided and proved the emergency/reason for [Claimant]'s absence from work and inability to notify." *Id.*

The document Claimant quotes from, and bases her argument on, however, does not appear in the record and the transcript of the hearing before the referee does not show that Claimant attempted to introduce it. Because that information lies outside the record in this case, we cannot consider it. "[I]t is a black letter law that an appellate court cannot consider anything which is not a part of the record in the case." *Commonwealth v. Young*, 317 A.2d 258, 264 (Pa. 1974) (quoting *McCaffrey v. Pittsburgh Athletic Association*, 293 A.2d 51, 57 (Pa. 1972)).

Moreover, the referee did not find that Claimant was not ill on the day she failed to report to work. Instead, the referee found that Claimant did not have a sufficient excuse for *failing to report* her illness to a manager prior to her shift. Claimant's FMLA paperwork did not show proof of an illness on December 11, nor did it document her inability to call into work prior to 7:45 p.m. that evening. (C.R. at Item No. 8, Ex. 1.) To the contrary, the FMLA paperwork indicated that, as of December 12, it was her doctor's opinion that Claimant would periodically require days off due to her illnesses. Thus, even if Claimant had entered the document she quotes from into the record, it would not show the referee's finding regarding her failure to timely call into work lacked substantial evidence.

Accordingly, discerning no error, we are constrained to affirm the order of the Board finding Claimant ineligible for benefits.

_____
PATRICIA A. McCULLOUGH, Judge

7

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Cathy L. Albert, | : |
| Petitioner | : |
| | : No. 1118 C.D. 2018 |
| v. | : |
| | : |
| Unemployment Compensation | : |
| Board of Review, | : |
| Respondent | : |

## *ORDER*

AND NOW, this 23rd day of May, 2019, the decision of the Unemployment Compensation Board of Review, dated June 13, 2018, is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge